1    GREGORY R. OXFORD (SBN 62333)
     goxford@icclawfirm.com
2    ISAACS CLOUSE CROSE & OXFORD LLP
     21515 Hawthorne Boulevard, Suite 950
3    Torrance, California 90503
     Tel.: (310) 316-1990
4    Fac.: (310) 316-1330

5    Attorneys for Defendant General Motors LLC

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10                   **SAN FRANCISCO DIVISION**

11

12   RYAN HINDSMAN and JAMES ANDREWS,            Case No. 3:17-cv-05337-JSC
     on behalf of themselves and all others similarly
13   situated,                                   **NOTICE OF MOTION AND MOTION
                                                  TO DISMISS FIRST AMENDED
14                                  Plaintiffs,   COMPLAINT; MEMORANDUM OF
                                                  POINTS AND AUTHORITIES**
15             v.
                                                  Date:    March 8, 2018
16                                                Time:    9:00 a.m.
     GENERAL MOTORS LLC,                          Courtroom F
17                                                Hon. Jacqueline Scott Corley
                                    Defendant.
18

19

20   **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

21        **PLEASE TAKE NOTICE** that on March 8, 2017, at 9:00 a.m., or as soon thereafter as

22   counsel may be heard, in the United States District Court, Northern District of California, San

23   Francisco Division, 450 Golden Gate Avenue, Courtroom F, before the Honorable Jacqueline

24   Scott Corley, defendant General Motors LLC ("GM") will move for an order

25        (1)  dismissing plaintiffs' First Amended Complaint as to all plaintiffs pursuant to Rules

26   8(a)(2), 9(b) and 12(b)(6) for failure to state a claim upon which relief can be granted; and

27        (2)  dismissing the First Amended Complaint as to all claims that the California plaintiffs

28   assert on behalf of purported class members who do not reside in and did not purchase vehicles in

California for lack of standing and consequent lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and, alternatively, for lack of personal jurisdiction pursuant to Rule 12(b)(2).

The motion is based on the annexed memorandum of points and authorities, the accompanying request for judicial notice and declaration, and all other pleadings and papers on file herein.

**STATEMENT OF ISSUES TO BE DECIDED [L.R. 7-4(a)(3)]:**

1.      Should plaintiffs' First Amended Complaint be dismissed under Rules 8(a)(2), 9(b) and 12(b)(6) for failure to state a claim upon which relief can be granted on the grounds set forth below?

(a)    Plaintiffs' breach of express warranty claims (First and Fifth Causes of Action) are barred because the GM warranty does not cover design defects and, alternatively, even assuming warranty coverage *arguendo*, plaintiffs did not present their vehicles to authorized GM dealers for repairs during the powertrain warranty period – five years or 100,000 miles, whichever came first after the initial new retail sale or lease of their vehicles.

(b)    Plaintiffs' claims that they were wrongly denied free-of-charge repairs under GM's Special Coverage Adjustments ("SCAs") are barred by their failure to allege facts showing that they satisfied the conditions for coverage under the SCAs.

(c)    Plaintiffs' nondisclosure claims under the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, and Unfair Competition Law, Cal. Bus. & Prof. Code § 1750 *et seq.* (Second and Third Causes of Action) are barred by their failure to plead particularized facts showing (1) an unreasonable safety hazard caused by the claimed defect that GM knew about pre-sale and had a duty to disclose; (2) reliance on the alleged nondisclosures; or (3) "active concealment" of the alleged defect.

(d)    Plaintiffs' breach of implied warranty claims (Fourth Cause of Action) are barred because (1) plaintiffs Andrews, Miranda and Maryanski did not receive any GM implied warranty when they purchased their used vehicles from third parties in transactions in which GM was not a seller; (2) plaintiffs Hindsman and Peterson do not allege facts plausibly showing their vehicles were unmerchantable during the maximum one-year implied warranty

period provided by California's Song-Beverly Act, Cal. Civ. Code §1791.1(c); and (3) all plaintiffs' breach of implied warranty claims are barred by the four-year statute of limitations that began running upon the initial new retail sale of their vehicles, *see* Cal. Coml. Code (UCC) § 2725.

2.     Should the First Amended Complaint be dismissed under Rules 12(b)(1) and 12(b)(2) as to all claims asserted by the plaintiffs on behalf of purported unnamed class members who do not reside and did not purchase their vehicles in California because (a) plaintiffs lack standing to assert such claims and (b) this Court lacks personal jurisdiction of such claims under *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017)?

1

**TABLE OF CONTENTS**

2

*Page*

3 PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ................................................ 1

4 ALLEGED AND JUDICIALLY NOTICEABLE FACTS ................................................................... 3

5       A.     The Original Plaintiffs' Vehicles and Oil Consumption Issues ........................ 3

6       B.     The New Plaintiffs' Vehicles and Oil Consumption Issues ............................. 5

7       C.     Plaintiffs' General Allegations ........................................................................ 6

8       D.     GM's Alleged Knowledge of Oil Consumption Issues .................................... 8

9       E.     The Special Coverage Adjustments ................................................................. 9

10 STANDARDS GOVERNING MOTIONS TO DISMISS ................................................................... 9

11 ARGUMENT ....................................................................................................................................... 10

12 I.     THE EXPRESS WARRANTY CLAIMS FAIL ON MULTIPLE GROUNDS .................. 10

13       A.     The GM Warranty Does Not Cover the Alleged Design Defects ................... 10

14       B.     Failure To Request Repairs During the Warranty Period ............................... 12

15       C.     Plaintiffs Have Not Alleged Facts Showing SCA Eligibility ......................... 14

16 II.    THE CLRA AND UCL CLAIMS FAIL AS A MATTER OF LAW ............................... 14

17       A.     GM Had No Pre-Sale Duty To Disclose the Alleged Defect .......................... 14

18             1.     *Plaintiffs Do Not Allege an Unreasonable Safety Hazard* ............... 14

19             2.     *Plaintiffs Do Not Adequately Plead GM's Knowledge of the*

20                 *Purported Defect Before the Initial Sale of Their Vehicles* .............. 17

21       B.     Plaintiffs Fail To Adequately Allege Reliance and Causation ....................... 19

22       C.     Plaintiffs Do Not Plead Facts Showing Concealment .................................... 20

23 III.   THE IMPLIED WARRANTY CLAIMS FAIL ON MULTIPLE GROUNDS ................... 20

24       A.     No GM Implied Warranty Covers Plaintiffs Who Bought Used Vehicles ...... 20

25       B.     Plaintiffs Hindsman and Peterson Do Not Allege a Breach Within

26             the Implied Warranty Period ........................................................................... 21

27       C.     The Implied Warranty Claims Are Barred by the Statute of Limitations ....... 22

28

1

IV.    THIS COURT LACKS JURISDICTION OF CLAIMS BY NON-RESIDENTS

WHO DID NOT BUY VEHICLES IN CALIFORNIA                     23

**CONCLUSION**                                                              25

1

**TABLE OF AUTHORITIES**

2

*Cases*                                                                                    *Page(s)*

3   *Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063 (S.D.Cal. 2015)   23

4   *American Suzuki Motor Co. v. Superior Court,* 37 Cal. App. 4th 1291 (1995)   21

5   *Andrew v. Radiancy, Inc.*, 2017 U.S. Dist. LEXIS 96384, 2017 WL 2692840

6       (M.D. Fla. June 22, 2017)   25

7   *Asghari v. Volkswagen Group of Am., Inc.*, 42 F. Supp. 3d 1306 (C.D. Cal. 2013)   16

8   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)   9

9   *Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071 (C.D. Cal. 2014)   2,21

10   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)   9,17

11   *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017)   3,23,25

12   *Brothers v. Hewlett-Packard Co*., 2007 U.S. Dist. LEXIS 13155 (N.D. Cal. Feb. 12, 2007)   10

13   *Cardinal Health 301, Inc. v. Tyco Electronics Corp.*, 169 Cal. App. 4th 116 (2008)   22,23

14   *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220 (C.D. Cal. 2011)   10

15   *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008)   10

16   *Corcoran v. CVS Health Corp.*, 2016 U.S. Dist. LEXIS 99797 (N.D. Cal. July 29, 2016)   23

17   *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006)   12,14,15

18   *Davidson v. Apple, Inc.*, 2017 U.S. Dist. LEXIS 36524, 2017 WL 976048

19       (N.D. Cal. Mar. 14, 2017)   2,10,11,19

20   *Demedicis v. CVS Health Corp.*, 2017 U.S. Dist. LEXIS 19589, 2017 WL 569157

21       (N.D. Ill. Feb. 13, 2017)   24

22   *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843 (N.D. Cal. 2012)   22

23   *Fenerjian v. Nongshim Co.*, 72 F. Supp. 3d 1058 (N.D. Cal. 2014)   24

24   *Ferrari v. Mercedes-Benz USA, LLC*, 2017 U.S. Dist. LEXIS 114271, 2017 WL 3115198

25       (N.D. Cal. July 21, 2017)   25

26   *Fitzhenry-Russell v. Dr. Pepper Snapple Grp.*, 2017 U.S. Dist. LEXIS 155654,

27       2017 WL 4224723 (N.D. Cal. Sept. 22, 2017)   25

28   *Gauthier v. AMF, Inc.*, 788 F.2d 634 (9th Cir. 1986)   16

*Gray v. Toyota Motor Sales, U.S.A.*, 2012 U.S. Dist. LEXIS 15992, 2012 WL 313703

    (C.D. Cal. Jan. 23, 2012), aff'd 554 Fed. Appx. 608 (9th Cir. 2014)      20,23

*Greene v. Mizuho Bank, Ltd.,* 2017 U.S. Dist. LEXIS 202802 (N.D. Ill. Dec. 11, 2017)      25

*Grodzitsky v. Am. Honda Motor Co.*, 2013 U.S. Dist. LEXIS 33387, 2013 WL 690822

    (C.D. Cal. Feb. 19, 2013)      17

*Grodzitsky v. Am. Honda Motor Co.*, 2013 U.S. Dist. LEXIS 82746, 2013 WL 2631326

    (C.D. Cal. Jun. 12, 2013)      22

*Harrison v. General Motors Co.*, No. 17-3128-CV-S-SRB (W.D. Mo. Sept. 25, 2017)      25

*Herremans v. BMW of North America, LLC*, 2014 U.S. Dist. LEXIS 145957

    (C.D. Cal., Oct. 3, 2014)      18

*Hodges v. Apple Inc.,* 2013 U.S. Dist. LEXIS 114374, 2013 WL 4393545

    (N.D. Cal. Aug. 12, 2013)      15

*In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008)      24

*In re Bridgestone/Firestone, Inc. Tire Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002),

    *cert. denied sub nom. Gustavson v. Bridgestone/Firestone, Inc.*, 537 U.S. 1105 (2003)      15

*In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015)      24

*In re Dental Supplies Antitrust Litig.*, 2017 U.S. Dist. LEXIS 153265, 2017 WL 4217115

    (E.D.N.Y. Sept. 20, 2017)      25

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009)      24

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007)      24

*In re MyFord Touch Consumer Litig.*, 46 F.3d 936 (N.D. Cal. 2014)      12

*In re Takata Airbag Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS 138976

    (S.D. Fla. Sept. 30, 2016)      22

*In re Toyota Motor Corp. Sudden Unintended Acceleration Mktg., Sales Practices*, & *Prods.*

    *Liab. Litig.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010)      12

*Investors Equity Life Holding Co. v. Schmidt*, 195 Cal. App. 4th 1519 (2011)      23

*Johnson v. Nissan N. Am., Inc.*, 2017 U.S. Dist. LEXIS 174573 (N.D. Cal. Aug. 29, 2017) 2,20,24

1   *Jordan v. Bayer Corp.*, 2017 U.S. Dist. LEXIS 109206, 2017 WL 3006993

2      (E.D. Mo. July 14, 2017) ................................................................................. 25

3   *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ....................................... 10

4   *Kent v. Hewlett-Packard Co.,* 2010 U.S. Dist. LEXIS 76818 (N.D. Cal. Jul. 10, 2010) ...... 21

5   *Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ....................................................... 8

6   *Lassen v. Nissan N. Am., Inc.*, 2016 U.S. Dist. LEXIS 139512 (C.D. Cal. Sept. 30, 2016) ...... 14

7   *Lee v. Toyota Motor Sales, U.S.A., Inc.,* 992 F. Supp. 2d 962 (C.D. Cal. 2014) ............. 21

8   *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087 (N.D. Cal. 2014) .......................... 22

9   *Marchante v. Sony Corp. of America, Inc.*, 801 F. Supp. 2d 1013 (S.D. Cal. 2011) .......... 21

10  *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111 ( 2002) ............................. 11

11  *McDonnell v. Nature's Way Prods., LLC*, 2017 U.S. Dist. LEXIS 177892, 2017 WL 4864910

12     (N.D. Ill. Oct. 26, 2017) ............................................................................... 24

13  *McVicar v. Goodman Global, Inc.*, 1 F. Supp. 3d 1044 (C.D. Cal. 2014) ....................... 21

14  *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297 (2009) ....................................... 22

15  *Mirkin v. Wasserman*, 5 Cal. 4th 1082 (1993) ..................................................... 19

16  *Mocek v. Alfa Leisure, Inc.,* 114 Cal. App. 4th 402 (2003) ..................................... 21

17  *Mollicone v. Universal Handicraft, Inc.*, 2017 U.S. Dist. LEXIS 14125, 2017 WL 440257

18     (C.D. Cal. Jan. 30, 2017) ............................................................................. 24

19  *Morales v. Unilever U.S., Inc.*, 2014 U.S. Dist. LEXIS 49336, 2014 WL 1389613

20     (E.D. Cal. Apr. 9, 2014) ............................................................................... 24

21  *Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d 1048 (N.D. Cal. 2013) ............. 24

22  *Parenteau v. GM, LLC*, 2015 U.S. Dist. LEXIS 31184, 2015 WL 1020499

23     (C.D. Cal. March 5, 2015) ............................................................................. 19

24  *Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir.), *cert. denied* 525 U.S. 1001 (1998) ......... 8

25  *Peterson v. Mazda Motor of Am., Inc.*, 44 F. Supp. 3d 965 (C.D. Cal. 2014) ................. 21

26  *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803 (9th Cir. 1984) ................. 12,13

27  *Philips v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 58954 (N.D. Cal. May 3, 2016) ......... 22,23

28  *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, ECF No. 48 (N.D. Cal. Feb. 13, 2015) ...... 19

*Real v. New York & Co.*, 2016 U.S. Dist. LEXIS 180633 (S.D. Cal. Dec. 28, 2016) .......... 24

*Resnick v. Hyundai Motor Am., Inc.*, 2017 U.S. Dist. LEXIS 67525

    (C.D. Cal. Apr. 13, 2017) .......... 2,17

*Resnick v. Hyundai Motor Am., Inc.*, 2017 U.S. Dist. LEXIS 139179

    (C.D. Cal. Aug. 21, 2017) .......... 21,23

*Rice v. Sunbeam Products, Inc.*, 2013 U.S. Dist. LEXIS 7467 (C.D. Cal. Jan. 7, 2013) .......... 12

*Rodriguez v. JLG Indus.*, 2012 U.S. Dist. LEXIS 196186 (C.D. Cal. Aug. 3, 2012) .......... 16

*Sandoval v. Mercedes-Benz USA, Inc.*, 2013 U.S. Dist. LEXIS 188997

    (C.D. Cal. Sept. 24, 2013) .......... 10

*Sharma v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 84406, 2014 WL 2795512

    (N.D. Cal. Jun. 19, 2014) .......... 10

*Sloan v. GM LLC*, 2017 U.S. Dist. LEXIS 120851 (N.D. Cal. Aug. 1, 2017) .......... 11,14,16,17

*Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980 (N.D. Cal. Sept. 13, 2010),

    aff'd 462 Fed. Appx. 660 (9th Cir. 2011) .......... 14

*Spratley v. FCA US LLC*, 2017 U.S. Dist. LEXIS 147492 (N.D.N.Y. Sept. 12, 2017) .......... 25

*Taragan v. Nissan N. Am., Inc.*, 2013 U.S. Dist. LEXIS 87148, 2013 WL 3157918

    (N.D. Cal. June 20, 2013) .......... 2,20

*Tietsworth v. Sears*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010) .......... 20

*Troup v. Toyota Motor Corp.*, 545 F. Appx. 668 (9th Cir. 2014) .......... 11

*Trusky v. General Motors Co.*, 2013 Bankr. LEXIS 620 (Bankr. S.D.N.Y. Feb. 19, 2013) .......... 11

*Turner v. Boehringer Ingelheim Pharms., Inc.*, 2017 U.S. Dist. LEXIS 122369,

    2017 WL 3310696 (E.D. Mo. Aug. 3, 2017) .......... 25

*Valencia v. Volkswagen Grp. of Am., Inc.*, 119 F. Supp. 3d 1130 (N.D. Cal. 2005) .......... 2,22

*Wenokur v. AXA Equitable Life Ins. Co.*, 2017 U.S. Dist. LEXIS 162812, 2017 WL 4357916

    (D. Ariz. Oct. 2, 2017) .......... 24

*Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017) .......... 1,10,14,15,16,17

*Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012) .......... 1,14,15,17,18

1

***Statutes and Rules***

2    Cal. Coml. Code § 2316(4)    12

3    Cal. Coml. Code § 2719(1)    12

4    Cal. Coml. Code § 2719(2)    12

5    Cal. Coml. Code § 2725    2,22,23

6    Cal. Coml. Code § 2725(2)    22

7    Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*    1

8    F.R.Civ. P. 8(a)(2)    1,9,10

9    F.R.Civ. P. 9(b)    1,2,10,19,20

10    F.R.Civ. P. 12(b)(1)    2,24

11    F.R.Civ. P. 12(b)(2)    2

12    F.R.Civ. P. 12(b)(6)    10

13    Magnuson Moss Act, 15 U.S.C. § 2301 *et seq.*    1

14    Magnuson Moss Act, 15 U.S.C. § 2310(e)    12

15    Song-Berverly Act, Cal. Civ. Code § 1791(a)    20,22

16    Song-Beverly Act, Cal. Civ. Code § 1791.1(c)    22

17    Song-Beverly Act, Cal. Civ. Code § 1792    20,22

18    Song-Beverly Act, Cal. Civ. Code § 1795.5    20

19    Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*    1

20    ***Other Authorities***

21    Rest. 2d Torts § 402A, comment j    16

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

This case arises out of alleged oil consumption issues in plaintiffs' Chevrolet Equinox vehicles that are or were fully covered by GM's powertrain warranty (five years or 100,000 miles after initial new vehicle delivery, whichever comes first) and, for model year 2010 through 2012 vehicles, by GM Special Coverage Adjustments ("SCAs") that extended coverage beyond expiration of the powertrain warranty by offering free-of-charge replacement of pistons and piston rings for the small percentage of Equinoxes that had higher than normal oil consumption.

Instead of taking advantage of these coverages, plaintiffs have brought this action on behalf of a proposed nationwide class and California sub-class of owners of model year 2010-17 Chevrolet Equinoxes ("Subject Vehicles") that supposedly have "one or more design and/or manufacturing defects" that cause them "to consume abnormally high amounts of oil (the 'Oil Consumption Defect')."  First Amended Complaint ("FAC"), ¶¶ 3, 62.

Plaintiffs' claims fall into three categories:  (1) alleged breach of express warranty under the Magnuson Moss Act, 15 U.S.C. § 2301 *et seq.* (First Cause of Action) and common law (Fifth Cause of Action); (2) alleged violation of California's Consumers Legal Remedies Act, Civ. Code § 1750 *et seq.* ("CLRA") and Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.* ("UCL") (Second and Third Causes of Action) based on non-disclosure of the alleged defect; and (3) alleged breach of implied warranty (Fourth Cause of Action).

Plaintiffs' express warranty claims fail because GM's warranty only covers "defects related to materials and workmanship," not the claimed design defects alleged by plaintiffs.  And even assuming coverage *arguendo*, plaintiffs' allegations do not satisfy the requirement that they request repairs from a GM dealership within the warranty period.  They also do not allege that they requested testing and/or eligible repairs within the applicable SCA coverage periods.

Plaintiffs' CLRA and UCL claims fail under Rules 8(a)(2) and 9(b) because (1) they do not allege particularized facts showing an unreasonable safety hazard that GM had a pre-sale duty to disclose, *see Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017); (2) they do not allege facts plausibly showing that GM knew about the alleged defect and hazard at the time it was distributing and marketing their vehicles for new retail sale by GM dealers, *see Wilson v.*

1   *Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012); *Resnick v. Hyundai Motor Am., Inc.*,

2   2017 U.S. Dist. LEXIS 67525, *53 (C.D. Cal. Apr. 13, 2017);[1] (3) they do not plead reliance on

3   the claimed nondisclosures with the particularity required by Rule 9(b), *see Davidson v. Apple,*

4   *Inc.*, 2017 U.S. Dist. LEXIS 36524, *29-31, 2017 WL 976048 (N.D. Cal. Mar. 14, 2017) (*held,*

5   omissions allegations were "too vague" to satisfy Rule 9(b) where, as here, plaintiffs did not

6   allege that they reviewed or "were exposed to *any* information, advertisements, labeling or

7   packaging" by the manufacturer) (emphasis in original); and (4) they do not allege the "specific

8   substantiating facts" or "affirmative acts of concealment" required to adequately plead "exclusive

9   knowledge" or "active concealment" of the claimed defect. *Taragan v. Nissan N. Am., Inc.,* 2013

10  U.S. Dist. LEXIS 87148, *21-25, 2013 WL 3157918 (N.D. Cal. June 20, 2013).

11          Plaintiffs' implied warranty claims fail because (1) plaintiffs Andrews, Miranda and

12  Maryanski bought used vehicles from third parties in transactions in which GM did not issue any

13  implied warranty; (2) plaintiffs Hindsman and Peterson do not plead a plausible factual basis for

14  their claim that the alleged defect rendered their new Equinoxes unmerchantable during the one-

15  year implied warranty period, *see Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071,

16  1079 (C.D. Cal. 2014) (no breach of implied warranty if an alleged defect does not "'drastically

17  undermine[] the ordinary operation of the vehicle'"); and (3) all implied warranty claims are

18  barred by limitations because plaintiffs did not file suit within 4 years of the new retail sales that

19  created any manufacturer implied warranties.  *See* Cal. Coml. Code § 2725; *Valencia v.*

20  *Volkswagen Grp. of Am., Inc.*, 119 F. Supp. 3d 1130, 1141 (N.D. Cal. 2005) (the "discovery rule"

21  does not postpone accrual of such claims, which occurs upon the initial new retail sale or lease).

22          Finally, the express warranty claims (both Magnuson Moss and common law)—the only

23  claims brought on behalf of the purported nationwide class—must be dismissed under Rules

24  12(b)(1) and 12(b)(2) as to all alleged class members who do not reside and did not purchase

25  vehicles in the State of California because (1) the California plaintiffs lack standing to assert such

26  claims, *see Johnson v. Nissan N. Am., Inc.*, 2017 U.S. Dist. LEXIS 174573, *19 (N.D. Cal. Aug.

27

28  ---

[1]  GM *later* discovered and disclosed oil consumption issues in *some* model year 2010, 2011 and 2012 Equinoxes caused by piston ring wear and issued the SCAs described above.

2

29, 2017), and (2) this Court lacks personal jurisdiction to adjudicate non-resident class member claims against GM, *see Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017).

**ALLEGED AND JUDICIALLY NOTICEABLE FACTS**

### A.      The Original Plaintiffs' Vehicles and Oil Consumption Issues

Plaintiff James Andrews purchased a used 2012 Chevrolet Equinox with 65,551 odometer miles on January 14, 2017 from a used car dealer, "Auto Source Car Sales."  FAC, ¶ 32.  About two weeks later, he "noticed his vehicle would start to subtly rock back and forth while coming to a stop" and he "started hearing a knocking noise," described as "spark knock," that allegedly worsened by late February 2017.  *Id*., ¶¶ 33-34.  A mechanic allegedly found that "over three-quarters of his vehicle's oil had already been consumed despite driving only 1,000 miles."  *Id*., ¶ 35.  The mechanic found a GM service bulletin online and took the vehicle to a GM dealership, which told him "there was no recall on the vehicle at that time."  *Id*., ¶ 36 (emphasis added).

On April 14, 2017, Andrews "contacted GM directly."  FAC, ¶ 38.  GM responded that if his vehicle was consuming more than one quart of oil per 2,000 miles, an SCA "would extend his warranty to remedy the issue within 7 years and 6 months of the date the vehicle was originally placed in service or 120,000 miles."  *Id.*, ¶ 19 & Exh. 1.  What the SCA actually said was this:

> [S]ome 2012 … Chevrolet Equinox vehicles, equipped with a 2.4L engine, may exhibit excessive oil consumption (less than 2,000 miles per quart of engine oil), due to piston ring wear.  If this condition is present, *an audible rattle or knock from the engine may be heard.  The engine oil pressure telltale may illuminate on the instrument panel or the following message may appear in the Driver Information Center:  "Oil Pressure Low – Stop Engine."* …  If this condition occurs on your 2012 Chevrolet Equinox within 7 years and 6 months of the date your vehicle was originally placed in service or 120,000 miles, whichever occurs first, the condition will be repaired for you at no charge.

FAC, Exh.1 (emphasis added).  After learning of the SCA, Andrews went to a GM dealership, but for some reason would not allow the dealership to test his vehicle's actual oil consumption rate to determine its eligibility for free repairs.  FAC, ¶¶ 40-41.  Instead, he continued "check[ing] his oil every 2 to 3 days" and changing his oil every 2,000 miles "to ensure that his vehicle has sufficient oil."  *Id*., ¶ 42.  His model year 2012 Equinox with 82,403 odometer miles is still within the seven-year, six- month and 120,000 mile limits for free piston and ring replacement under the SCA.  *Id.*, Exh. 1.  So assuming *arguendo* that Andrews is correct about his oil consumption rate

3

1   (which GM does not know because he would not permit it to be tested), the alleged "time-

2   consuming" oil checks and changes and fear of "long trips" are the result of his own conduct and

3   could have been avoided entirely if he had agreed to have his vehicle tested and, if eligible,

4   repaired at no cost. *Id.*, ¶ 42.

5         Plaintiff Ryan Hindsman bought his Equinox new in January 2010. FAC, ¶ 20. After

6   about 5,000 odometer miles, a service technician told him it was "bone dry inside"; he then began

7   "manually" adding oil between oil changes. *Id.*, ¶ 22. At about 18,000 miles "[o]n or around

8   February 2011," he told a GM dealership service technician "that his vehicle was "over

9   consuming oil between routine oil changes." *Id.*, ¶ 23. Then, in February or March 2011, his

10  vehicle allegedly began making a "gurgling" sound that would improve temporarily after adding

11  oil, but would resume after "routine" driving; he also noticed a knocking sound. *Id.*, ¶ 24.

12        In about March 2014, Hindsman received a letter from GM notifying him of a Special

13  Coverage Adjustment similar to the notice Andrews received, *i.e.*, GM would repair his engine by

14  replacing the pistons and piston rings free-of-charge if its oil consumption rate exceeded one

15  quart per 2,000 miles. FAC, ¶ 30; *see id.*, ¶ 38. The letter also disclosed as symptoms an audible

16  knock, illumination of the low oil pressure telltale and the Driver Information Center warning:

17  "Oil Pressure Low – Stop Engine." *Id.*, ¶ 26; *see id.*, ¶ 26 & Exh. 1. About one year later, in

18  spring 2015 (more than five years after his initial purchase, *ergo* after the powertrain warranty

19  had expired), Hindsman took the SCA notice and his vehicle to an independently owned and

20  operated GM dealer and was told by a service technician that it had "failed the oil consumption

21  test," that it "was consuming excessive oil," and that "his vehicle would be repaired the following

22  week." *Id.*, ¶ 27. But when he returned for the repairs, the service technician who allegedly

23  promised the repairs was no longer working at the dealership and his vehicle's oil consumption

24  was re-tested. *Id.*, ¶ 28. This time it passed and he was told that no repairs would be made. *Id.*

25  Mr. Hindsman apparently did not contact GM to seek its assistance with this issue.

26        Hindsman alleges he has added about 12 quarts per year to his vehicle "between regularly

27  scheduled oil changes" for a total of approximately 60-70 quarts between oil changes. FAC, ¶ 30.

28  Yet he does not allege that he ever asked a GM dealer for a re-test after spring 2015. At 115,082

4

odometer miles (*id.*, ¶ 31), his vehicle remains within the ten-year, 120,000 mile window for free-of-charge repairs under the 2010 SCA, provided that testing confirms higher than normal oil consumption.  The same opportunity continues to exist for Mr. Andrews, whose model year 2012 Equinox has less than 120,000 miles and is less than 7-1/2 years old.

### B.    The New Plaintiffs' Vehicles and Oil Consumption Issues

Plaintiff Robin Peterson purchased a new model year 2013 Equinox in December 2012.  FAC, ¶ 44.  In or around August 2013, a dealer told her during a routine oil change that it was "burning oil."  In January 2016, "with approximately 100,000 miles on her vehicle," the dealership told her the vehicle was "not 'burning oil,' but instead the oil level was low because she uses her vehicle more than the average driver."  *Id.*, ¶ 47.  About a month later (presumably after the 100,000 mile warranty had expired), she noticed "a knocking noise while driving," found no oil visible on the dipstick and added a quart; since then, her vehicle "has made a knocking sound when driving on almost a daily basis."  *Id.*, ¶ 48.  She has started checking her oil level between regular oil changes and adding a quart when indicated by the dipstick; since February 2016 she has added approximately 20 quarts of oil in addition to regular oil changes.  *Id.*, ¶ 49.  Her five-year-old vehicle now has approximately 160,000 odometer miles and allegedly continues to make "a knocking sound" and consume "excessive amounts of oil."  *Id.*, ¶ 50.

Plaintiff Diana Miranda purchased a used model year 2012 Equinox from a Nissan dealer on January 3, 2015 when it had 40,736 odometer miles.  FAC, ¶¶ 51-52.  On October 5, 2017, she heard "a loud rattling noise coming from her engine" and "a knocking noise" while driving to work.  *Id.*, ¶ 53.  She says her vehicle then showed an "Emergency Engine Shut Off" warning and shut down.  *Id.*  After "coasting" into her work parking lot, she checked the dipstick and found it was "completely dry" despite an oil change less than two months earlier.  *Id.*  She claims that her "online oil level percentage on her dash" showed her vehicle "had 68% oil level" when it actually "had little to no oil left."  *Id.* (this is a reference to her vehicle's "Oil *Life* Monitor" which, as plaintiffs admit, estimates remaining oil *quality*—not  *quantity*—to determine when the oil should be changed).  Plaintiff then added two quarts of oil and attempted to re-start the vehicle, which "smoked profusely"; she then had the vehicle towed.  *Id.*, ¶ 55.  A dealership service technician

told her the engine "was completely ruined and a complete engine replacement was required."

*Id.*, ¶ 56.  The dealership told her that GM would not cover this repair, but she does not say why.

*Id.*  She says she was unable to afford the repair, so her vehicle is "inoperable."  *Id.*, ¶ 57.

Although her vehicle has 91,787 odometer miles (*id.*), the five-year powertrain warranty

apparently has expired; but she is still well within the seven-and-one-half-year, 120,000 mile

window for SCA repairs.  *See* FAC, ¶ 38 & Exh. 1.

Plaintiff Vanessa Maryanski purchased a used model year 2011 Equinox on February 25,

2012 with approximately 5,000 odometer miles.  FAC, ¶ 58.  More than three years later, in April

2015, she heard a knocking noise.  *Id.*, ¶ 60.  Since then she has added oil between regularly

scheduled oil changes.  *Id.*, ¶ 61.  In 2016, her engine "completely shut off on its own" at a stop

light, but she was able to restart it.  *Id.*, ¶ 62.  In July 2017, she took her vehicle to a Chevrolet

dealership and requested that it be fixed "pursuant to the Service Bulletin described herein."  *Id.*,

¶ 63.  The dealership diagnosed her vehicle "with a multitude of [unspecified] issues, yet none

were fixed pursuant to the Service Bulletin described herein."  *Id.*  The vehicle remains

unrepaired.  *Id.*, ¶ 64.  She does not allege the current mileage so it is unclear whether it may be

eligible for repairs under the model year 2011 SCA if in fact it has oil consumption issues.

## C.    <u>Plaintiffs' General Allegations</u>

Plaintiffs allege that their vehicles have "one or more design and/or manufacturing

defects, including but not limited to defects … that cause them to be unable to properly utilize the

engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of

oil…."  FAC, ¶¶ 3, 71.  The "Low-Tension Oil Rings" used in the engines allegedly do not apply

"sufficient tension to prevent oil from being consumed in the combustion chamber, which in turn

fouls spark plugs, and creates harmful carbon buildup in the pistons and cylinders" that causes

"pre-ignition detonation, or 'spark knock'" and resulting wear; the engine also allegedly

"vaporizes the cylinder wall oil film, pushing it past the rings and into the crankcase where it is

vacuumed into the intake manifold via the Positive Crankcase Ventilation ('PCV') system."  *Id.*,

¶¶ 74-83, 87-89.  As a remedy, GM has "offered a repair … that include(s) … improving piston

1   rings oil and combustion gas control by decreasing the ring end gaps, adding a protective coating

2   increasing the ring radial thickness, and increasing the ring height….” *Id*., ¶ 84.

3        Plaintiffs also allege that their engines “spray oil onto the piston skirt and cylinder wall

4   [which] overloads and fouls the defective piston rings, triggering oil to migrate past the piston

5   rings into other places in the engine.” FAC, ¶ 85.  This allegedly results in carbon buildup on the

6   piston rings that “interferes with the rings’ seating in their grooves” and the rings’ ability to seal

7   out oil.  *Id*., ¶ 86.  The rings then “lose proper groove seating [and] become misaligned with the

8   cylinder bores,” leading to ring deterioration.  *Id*.

9        Plaintiffs also complain that their vehicles’ “Oil Life Monitoring System” (which they

10  admit is designed to estimate oil *quality*, not *quantity*), as well as the low oil pressure gauge and

11  oil canister light on the dash, do not adequately warn drivers of low oil levels.  FAC, ¶¶ 91-96.

12       Plaintiffs refer to these various issues collectively as the “Oil Consumption Defect” and

13  claim it “results in excessive oil consumption, pre-ignition detonation, ring wear, ring folding,

14  ring failure, and spark plug fouling,” leading to “inadequate engine lubricity,… increased friction,

15  heat, metal on metal contact, and resulting engine damage.” FAC, ¶¶ 3, 97-101.

16       Plaintiffs claim the alleged defect “is unreasonably dangerous because it can cause engine

17  failure … at any time and under any driving conditions or speeds, exposing … the drivers, their

18  passengers, and others who share the road with them to serious risks of accidents and injury.”

19  FAC, ¶ 4.  *But they do not allege that they—**or anyone else**—has ever had an accident, much less*

20  *suffered any injuries as a result of the alleged defect.*  They also allege that the engines may

21  overheat and “*potentially* catch fire.” *Id.*, ¶¶ 104-05 (emphasis added).  But, again, they do not

22  allege that any engine fires actually have occurred as a result of the claimed defect.  They also

23  acknowledge that GM warns owners not to keep driving if they receive a low oil pressure

24  warning.  *Id.*, ¶ 102; Request for Judicial Notice (“RJN”), Exhs. A, B, C, D.

25       The Subject Vehicles were covered by GM’s powertrain warranty for five years or

26  100,000 miles, whichever came first; the pertinent terms of the warranty were as follows:

27       **Repairs Covered.** The warranty covers repairs to correct any vehicle defect … related to

28       materials or workmanship occurring during the warranty period….

7

1  **No Charge.**  Warranty repairs, including towing, parts, and labor, will be made at no charge.

2  **Obtaining Repairs.**  To obtain warranty repairs, take the vehicle to a Chevrolet dealer

3  facility within the warranty period and request the needed repairs.  A reasonable time

4  must be allowed for the dealer to perform necessary repairs.

5  **Warranty Period.**  The warranty period for all coverages begins on the date the vehicle

6  is first delivered or put in use and ends at the expiration of the coverage period.

7  However, "[d]amage caused by failure … to use or maintain proper fluids, or maintain fluids

8  between recommended maintenance intervals" are not covered.  RJN, Exhs. E (pp. 4, 8), F (pp. 4,

9  11), G (pp. 4, 11) and H (pp. 4, 11).[2]

10  ### D.  GM's Alleged Knowledge of Oil Consumption Issues

11  Plaintiffs allege, in conclusory terms, that GM "actively concealed" the alleged defect

12  "along with the attendant dangerous safety problems and associated costs," causing purchasers

13  "to experience the [alleged defect] through the life of [their vehicles]…."  FAC, ¶¶ 15-16.  To

14  support the allegation that GM knew of the alleged defect before they bought their vehicles

15  plaintiffs quote a number of online postings on the website of the National Highway Traffic

16  Safety Administration ("NHTSA") and on a third-party website.  Of the twenty-two NHTSA

17  postings, however, *twenty* were not posted until March 2017 or later (after all five plaintiffs had

18  purchased their vehicles) and the other two were posted on May 15, 2015 and October 2016, long

19  after (a) the initial new retail sale of all plaintiffs' model year 2010-13 Equinoxes and (b) GM had

20  concluded its marketing and distribution of new 2010-13 Equinoxes to GM dealers for retail sale.

21  FAC, ¶ 123, pp. 24-32.[3]  The other 21 complaints were posted on www.carcomplaints.com

22  beginning in December 2012, after the initial new retail sale of all but two plaintiffs' vehicles.[4]

23

24  [2] Under the "incorporation by reference" doctrine, the GM Owners Manuals and warranties may be judicially noticed because plaintiffs allege their contents (FAC, ¶¶ 16, 17, 20, 32, 44, 51, 56,

25  58, 66, 102, 105, 123, 161, 162, 208, 209), they are central to their claims, and their authenticity is not disputed.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Parrino v. FHP, Inc.*, 146

26  F.3d 699, 706 n. 4 (9th Cir.), *cert. denied* 525 U.S. 1001 (1998).

27  [3] Ten of these postings involved model year 2012 Equinoxes; five were about 2010 models, two were about 2011 models and five were about model year 2013 Equinoxes.

28  [4] Number of postings by year of posting:  2012 (1); 2013 (1); 2014 (2); 2015 (9); 2016 (5); 2017 (3).  All of these postings were about model year 2012 Equinoxes.

8

Ms. Peterson purchased her new 2013 Equinox in December 2012, after only one of these complaints had been posted (in November 2012).  FAC, ¶ 123, p. 37.  Mr. Andrews purchased his 2012 Equinox used on January 14, 2017 from a non-GM dealer, but the initial new retail sale of his vehicle by a GM dealer almost certainly pre-dated all of these complaints (the first of which was posted in November 2012, when new 2013 models were on sale).  *Id.*  Under the incorporation by reference doctrine, the Court may judicially notice these postings because plaintiffs allege their contents and they are indisputably authentic.  *See* note 2 *supra.*  These postings do not demonstrate GM's knowledge of the alleged defect *at the time it was marketing and distributing plaintiffs' vehicles for new retail sale.*

### E.      The Special Coverage Adjustments

After all five plaintiffs' vehicles were initially sold as new vehicles, and as five-year, 100,000 mile powertrain warranties for model year 2010, 2011 and 2012 Equinoxes were expiring, GM in response to oil consumption concerns issued the SCAs referenced in plaintiffs' complaint and sent letters to potentially involved owners offering to replace the pistons and rings if their engines exhibited higher than normal oil consumption.  FAC, ¶¶ 25-26, 38-39 & Exhs. 1 & 4; RJN, Exhs. I, J & K.  These actions were the opposite of "concealment" and conclusively refute the allegations that "GM has never disclosed" oil consumption issues to consumers and "attempted to squelch public recognition" of it "by propagating the falsehood that … excessive oil consumption" is "normal."  FAC, ¶ 128.  To the contrary, GM affirmatively advised owners of the issue and offered to repair at no cost the small percentage of vehicles with higher than normal oil consumption.

### STANDARDS GOVERNING MOTIONS TO DISMISS

Rule 8(a)(2) requires factual allegations sufficient "to raise a right to relief *above the speculative level….*"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (citations omitted).  And under

9

1   Rule 12(b)(6), only alleged *facts* are assumed to be true, not legal conclusions.  *Cholakyan v.*

2   *Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1231 (C.D. Cal. 2011).

3         Beyond the Rule 8(a)(2) plausibility requirement, Rule 9(b) requires particularized fact

4   pleading of the CLRA and UCL claims because they "sound in fraud."  *Kearns v. Ford Motor*

5   *Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  "For an omission to be actionable under the CLRA or

6   UCL, it must be either contrary to a representation actually made by the defendant, or an

7   omission of a fact the defendant was obligated to disclose."  *Sandoval v. Mercedes-Benz USA,*

8   *Inc.*, 2013 U.S. Dist. LEXIS 188997 at * 41 (C.D. Cal. Sept. 24, 2013) (citation omitted).

9         Finally, a duty to disclose a claimed defect exists only if it creates an unreasonable safety

10   hazard that the defendant knows about at the time of sale.  *William*s, 851 F.3d at 1025.

11                              **ARGUMENT**

12   **I.      THE EXPRESS WARRANTY CLAIMS FAIL ON MULTIPLE GROUNDS**

13         Plaintiffs' First and Fifth Causes of Action assert breach of GM's limited express

14   warranties under the Magnuson Moss Act and common law, respectively.  The Magnuson Moss

15   Act does not create new warranty obligations but merely provides a federal remedy for breach of

16   state law warranties; thus, the First Cause of Action "stand[s] or fall[s]" (here, falls) with the state

17   law claims.  *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

18         **A.      The GM Warranty Does Not Cover the Alleged Design Defects**

19         Plaintiffs claim "one or more design and/or manufacturing defects," but do not specify

20   whether the various issues they have raised relate to design or manufacturing.  The GM warranty

21   only covers "defects related to materials or workmanship," not design defects.  RJN, Exhs. E (p.

22   4); F (p. 4), G (p. 4) & H (p. 4); *Sharma v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 84406,

23   *11, 2014 WL 2795512 (N.D. Cal. Jun. 19, 2014); *Lee v. Toyota Motor Sales, U.S.A., Inc.,* 992 F.

24   Supp. 2d 962, 978 (C.D. Cal. 2014); *Brothers v. Hewlett-Packard Co*., 2007 U.S. Dist. LEXIS

25   13155, *14 (N.D. Cal. Feb. 12, 2007).

26         Here, as Judge Koh recognized in *Davidson v. Apple, Inc.*, 2017 U.S. Dist. LEXIS 36524,

27   *34, "plaintiffs' chosen language is not dispositive in determining whether the alleged defect is a

28   defect in design or a defect in 'materials and workmanship;" thus, the Court must "determine

                              10

1  whether [p]laintiffs allege a defect in 'design' or a defect in 'materials and workmanship.'" *Id.*,

2  citing *Troup v. Toyota Motor Corp.*, 545 F. Appx. 668, 668-69 (9th Cir. 2014).

3      Plaintiffs' defect allegations focus exclusively on design, including the selection of "Low-

4  Tension Oil Rings" that allegedly "do not apply sufficient tension to prevent oil from being

5  consumed in the combustion chamber," allegedly leading to fouled spark plugs and carbon

6  buildup. FAC, ¶ 75; *see also id.*, ¶¶ 74, 76-83.  Plaintiffs' other defect allegations also focus on

7  design, including (1) "spray jets that spray oil onto the piston skirt and cylinder wall, *which is not*

8  *common to other engines with wider piston rings*," allegedly leading to carbon buildup and ring

9  deterioration (*id.*, ¶¶ 85-86, emphasis added), (2) a PCV system that allegedly "vacuums oil from

10  the valve train and feeds it into the intake manifold runners and ultimately into the combustion

11  chambers" (*id.*, ¶ 89), and (3) Oil Life Monitoring systems and low oil pressure warnings that

12  allegedly do not alert drivers to low oil levels (*id.*, ¶¶ 91-95).  These are exactly the same types of

13  issues found in *Trusky v. General Motors Co.*, 2013 Bankr. LEXIS 620, *18-19 (Bankr. S.D.N.Y.

14  Feb. 19, 2013), where the Court held that "GM can be required [under the warranty] to replace

15  spindle rods that were defective because of materials or workmanship with new spindle rods of

16  the same design within the warranty period, *but it cannot be required to change the design of the*

17  *spindle rods*") (emphasis added).  As *Davidson* explains:

18      "A design defect … exists when the product is built in accordance with its intended
        specification, but the design itself is inherently defective."  …  The crux of Plaintiffs'

19      allegations is that the iPhone 6 and 6 Plus were "build in accordance with [their]
        intended specifications," but that Defendant chose materials for the iPhone 6 and 6

20      Plus that are insufficient to protect the iPhone's internal components….  A
        manufacturer's choice to use a certain material to construct a product is a "design

21      decision," not a defect in "materials and workmanship."

22  2017 U.S. Dist. LEXIS 36524, *35-36, citing *McCabe v. Am. Honda Motor Co.*, 100 Cal.

23  App. 4th 1111, 1120 ( 2002).  Here, the choice of material for piston rings was plainly a

24  "design decision," not a "defect in materials and workmanship," and therefore falls outside

25  the scope of the GM warranty, along with the other design decisions detailed above.  That

26  was exactly the holding in *Sloan v. GM LLC*, 2017 U.S. Dist. LEXIS 120851,*18-19 (N.D.

27  Cal. Aug. 1, 2017), where plaintiffs also complained about the design of "Low-Tension Oil

28  Rings" in another GM engine.

1          **B.        Failure To Request Repairs During the Warranty Period**

2          When purchased new, plaintiffs' vehicles were covered by GM's powertrain warranty for

3   5 years or 100,000 miles, whichever came first.  RJN, Exhs. E, F, G & H.  Upon re-sale, the GM

4   warranty continued for the remaining warranty period.  FAC, ¶ 17.  Even assuming *arguendo* that

5   the alleged defects were covered by the GM warranty (which they were not), both the GM

6   Warranty and the Magnuson Moss Act required plaintiffs to present their vehicles to authorized

7   GM dealers for repair during the warranty period.  RJN, Exhs. E, F, G & H; 15 U.S.C. § 2310(e)

8   ("No action . . . may be brought . . . for failure to comply with any obligation under any written or

9   implied warranty . . . unless the person obligated under the warranty … is afforded a reasonable

10  opportunity to cure such failure to comply").  Further, under California law, free-of-charge repair

11  or replacement is the *exclusive* remedy under the GM Warranty.  *See* RJN, Exh. E (p. 10), Exh. F

12  (p. 13); Exh. G (pp. 12-13) & Exh. H (pp.12-13); *Rice v. Sunbeam Products, Inc.*, 2013 U.S. Dist.

13  LEXIS 7467, *34 (C.D. Cal. Jan. 7, 2013); Cal. Coml. Code §§ 2316(4), 2719(1).  This limitation

14  of remedy bars damage suits for breach of warranty unless successful repairs are not completed

15  after a reasonable number of attempts, such that the repair remedy "fails of its essential purpose."

16  Cal. Coml. Code § 2719(2); *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 808 (9th Cir.

17  1984) ("a repair or replace remedy fails of its essential purpose only if repeated repair attempts

18  are unsuccessful within a reasonable time") (emphasis omitted).  Here, plaintiffs do not allege

19  that they timely requested warranty repairs, let alone that any dealership denied free repairs, or

20  that repeated repair attempts were unsuccessful.

21          Mr. Hindsman purchased his model year 2010 Equinox in January 2010, but does not

22  allege that he requested repairs until the spring of 2015, after his five-year warranty had expired.

23  Repairs after warranty expiration are not covered.  *Daugherty v. Am. Honda Motor Co.*, 144 Cal.

24  App. 4th 824, 830-32 (2006); *In re MyFord Touch Consumer Litig.*, 46 F.3d 936, 970 (N.D. Cal.

25  2014) (dismissing claims of plaintiffs who did not allege presentation to a dealer for repair during

26  the warranty period); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices*,

27  *Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1179 (C.D. Cal. 2010) (plaintiffs who did not seek

28  repairs "may not pursue a claim for breach of express warranty….").

1     Mr. Andrews's 2012 Equinox was first taken to a GM dealer sometime after February

2   2017.  FAC, ¶¶ 35-36.  He does not allege that this was within the warranty period because he

3   does not allege the date of his vehicle's initial new retail sale; thus, it cannot be determined when

4   the warranty expired.[5]  His claim is also barred because he does not allege *repeated* unsuccessful

5   repair attempts or denial of repairs.  *Philippine Nat'l Oil Co.*, 724 F.2d at 808.

6     Ms. Peterson does not allege that she *ever* requested repairs for oil consumption issues, let

7   alone within 100,000 odometer miles.  Instead, she only says she was advised *during routine oil*

8   *changes* that her vehicle "was burning oil" or, later, that it was not "'burning oil,' but instead the

9   oil level was low because she uses her vehicle more than the average driver."  FAC, ¶¶ 46-47.

10  Then, "in approximately February 2016," after her vehicle had reached "approximately 100,000

11  miles" in the prior month (January 2016), she noticed for the first time a "knocking" noise that

12  her attorneys now claim to be symptomatic of engine damage.  *Id.*, ¶¶ 47-48.  Yet she does not

13  allege any *actual* engine damage after driving her five-year-old vehicle 160,000 miles.  *Id.*, ¶ 50.

14  And, again, she does not allege that she *ever* requested repairs, let alone within the warranty

15  period; instead, beginning in February 2016 she has "made a habit of continually checking her oil

16  level," as GM recommends in the Owners Manual.  *Id.*, ¶ 49; RJN, Exhs. A (p. 9-10), B (pp. 10-

17  10, 10-11), C (pp. 10-10, 10-11), D (pp. 10-8, 10-9, 10-10).

18    Ms. Miranda does not allege making any repair request on her used model year 2012

19  Equinox before the October 5, 2017 incident.  FAC, ¶ 53-56.  Like Mr. Andrews, she does not

20  allege the date her vehicle was initially sold new by a GM dealer, so it cannot be determined

21  whether the five-year powertrain warranty expired before that incident.  But she says the dealer

22  told her GM would not cover the repair, strongly implying it had expired.  FAC, ¶ 56.[6]

23    Ms. Maryanski purchased her used model year 2011 Equinox on February 25, 2012 and

24  first requested repairs in July 2017, after the five-year warranty had expired.  FAC, ¶ 63.

25

26  _____

27  [5]  In fairness, Mr. Andrews may not know the initial sales date, but GM's records show it was in
    August 2011, more than five years before Andrews bought his vehicle and sought repairs in 2017.

28  [6]  GM's records show that the initial sale date was in September 2011, so the powertrain warranty
    expired at the latest in September 2016, more than one year before the October 2017 incident.

13

C.       **Plaintiffs Have Not Alleged Facts Showing SCA Eligibility**

The SCAs are not warranties.  They apply only after expiration of GM's express warranty.  Further, the SCAs for model year 2010, 2011 and 2012 Subject Vehicles require that a GM dealer determine eligibility for free repairs by testing the oil consumption rate.  RJN, Exhs. I, J & K.  Mr. Andrews declined testing, so GM could not determine his eligibility under the SCA.  FAC, ¶¶ 40-41 & Exh. 2.  Mr. Hindsman's most recent oil consumption test (in April 2015) apparently showed he did not qualify.  *Id.*, ¶ 28.  While he now claims oil consumption that, taking his allegations *arguendo* at face value, would make him eligible (*id.*, ¶ 30), he has never had his vehicle re-tested.  Ms. Miranda's vehicle apparently has not been inspected to determine the cause the total engine replacement that she was told would be necessary to repair her Equinox.  *Id.*, ¶ 56.  Ms. Maryanski purchased a used model year 2011 Equinox that may be within the seven-and-one-half-year window for repairs under the 2011 SCA, but she has not alleged the initial sale date or odometer mileage less than 120,000, or had its oil consumption tested.

GM believes it would be a waste of judicial and litigant resources for this action to proceed before these plaintiffs' vehicles are examined and tested and, if they meet SCA eligibility requirements, repaired free-of-charge, which would moot their claims.  GM stands ready and willing to facilitate this process.

## II.       THE CLRA AND UCL CLAIMS FAIL AS A MATTER OF LAW

### A.       **GM Had No Pre-Sale Duty To Disclose the Alleged Defect**

#### 1.       *Plaintiffs Do Not Allege an Unreasonable Safety Hazard*

Plaintiffs' Second and Third Causes of Action under the CLRA and UCL do not allege any affirmative misrepresentations, but instead claim nondisclosure.  Under California law, a manufacturer has no duty to disclose unless a defect creates an unreasonable safety hazard.  *Daugherty*, 144 Cal. App. 4th at 835; *Williams*, 851 F.3d at 1025; *Sloan*, 2017 U.S. Dist. LEXIS 120851,*18-19; *Lassen v. Nissan N. Am., Inc.*, 2016 U.S. Dist. LEXIS 139512, *44 (C.D. Cal. Sept. 30, 2016) ("Where a plaintiff's claim is that the material fact that the seller had a duty to disclose is a defect, materiality requires that the defect pose a safety concern"), citing *Wilson*, 668 F.3d at 1141-43 (district court did not err "in requiring Plaintiffs to allege

14

1    that the design defect caused an unreasonable safety hazard"); *Smith v. Ford Motor Co.*, 749 F.

2    Supp. 2d 980, 987-88 (N.D. Cal. Sept. 13, 2010), aff'd 462 Fed. Appx. 660 (9th Cir. 2011);

3    *Hodges v. Apple Inc.,* 2013 U.S. Dist. LEXIS 114374, *8-9, *13-14, 2013 WL 4393545 (N.D.

4    Cal. Aug. 12, 2013).

5         The rationale for this rule is that "to broaden the duty to disclose beyond safety

6    concerns would eliminate term limits on warranties, effectively making them perpetual or at

7    least for the 'useful life' of the product."  Thus, the "[f]ailure of a product to last forever would

8    become a 'defect,' a manufacturer would no longer be able to issue limited warranties, and

9    product defect litigation would become as widespread as manufacturing itself."  *Wilson*, 668

10   F.3d at 1142-43.  Self-evidently, all vehicles and vehicle components wear out *eventually*, but

11   that does not make them "defective."

12        Plaintiffs allege that the alleged defect is unreasonably dangerous because it "*can* cause

13   engine failure" or "*potentially*" cause a fire.  FAC, ¶¶ 11, 104-05 (emphasis added).  These

14   allegations do not suffice.  "[A] party's allegations of an unreasonable safety hazard must

15   describe more than merely 'conjectural and hypothetical' injuries."  *Williams*, 851 F.3d at 1028.

16   Allegations of a safety risk based entirely on the "potential" for accidents or injuries do not show

17   liability for non-disclosure.  *See In re Bridgestone/Firestone, Inc. Tire Prods. Liab. Litig.*, 288

18   F.3d 1012, 1017-19 (7th Cir. 2002), *cert. denied sub nom. Gustavson v. Bridgestone/Firestone,*

19   *Inc.*, 537 U.S. 1105 (2003) & cases cited ("No injury, no tort, is an ingredient of every state's law.

20   … [Safety] Regulation by [NHTSA], coupled with tort litigation by persons suffering physical

21   injury, is far superior to a suit by millions of *uninjured* buyers for dealing with consumer products

22   that are said to be failure-prone.") (emphasis in original).

23        As in *Daugherty*, the complaint in this case is "devoid of factual allegations showing any

24   instance of physical injury or any [non-hypothetical] safety concerns posed by the defect."  144

25   Cal. App. 4th at 836.  Plaintiffs do not allege that they, *or anyone else*, has *ever* had an accident

26   or been injured as a result of the alleged defect.  Similarly, one alleged safety risk in *Williams* was

27   a fire; in declining to find an "unreasonable safety risk," the Ninth Circuit relied upon the "lack

28   [of] any allegations indicating that any customer, much less any plaintiff experienced such a

15

1    fire—a notable omission if the alleged unreasonable safety hazard arises in *all* Yamaha outboard

2    motors sooner or later."  851 F.3d at 1028-29 (emphasis in original).  That is ***exactly*** this case:

3    plaintiffs do not claim they *or anyone else* have *ever* been injured by the alleged defect.  As in

4    *Williams*, this is a "notable omission" given that many of the Subject Vehicles have been driven

5    more than 8 years and more than 100,000 miles (160,000 miles in the case of Ms. Peterson's

6    vehicle) since the first model year 2010 Equinoxes were sold new in 2009.

7         Further, before any fire or engine shutdown the driver receives warnings of low oil

8    pressure, including illumination of an oil pressure telltale and the Driver Information Center

9    warning "Low Oil Pressure – Stop Engine."  FAC, ¶¶ 26, 39; RJN, Exhs. A (p. 4-23), B (p. 5-18),

10   C (p. 5-21) & D (p. 5-19).  As Judge Chen concluded in rejecting similar claims:

11         … [An] oil pressure indicator … *warns drivers of low oil levels*, a fact that both
12         GM and CA Plaintiffs agreed to during oral argument. Because drivers will thus
           admittedly have warning before any engine damage, there is no risk of sudden or
13         surprising failure, which might give rise to a serious safety concern.

14   *Sloan*, 2017 U.S. Dist. LEXIS 120851,*21 (emphasis in original; footnotes omitted).

15         This analysis finds support in the analogous law of strict products liability.  As stated in

16   Rest. 2d Torts § 402A, comment j (emphasis added):

17         Where warning is given, the manufacturer may reasonably assume that it will
           be read and heeded; and a product bearing such a warning, which is safe for use if it is
18         followed, is not in a defective condition, *nor is it unreasonably dangerous*.

19   The Ninth Circuit and many other courts recognize this rule.  *See*, *e.g.*, *Gauthier v. AMF, Inc.*,

20   788 F.2d 634, 635-36 (9th Cir. 1986) (citing other cases holding that "where adequate warnings

21   are given, a product is neither defective nor unreasonably dangerous"); *Rodriguez v. JLG Indus.*,

22   2012 U.S. Dist. LEXIS 196186, *52 (C.D. Cal. Aug. 3, 2012) (citing section 402A, comment j

23   and other decisions reaching the same conclusion).

24         In this case, the driver receives an express warning and direction:  "OIL PRESSURE

25   LOW STOP ENGINE."  FAC, ¶¶ 26, 39.  If this warning is heeded, there is no "risk of sudden or

26   surprising failure, which might give rise to a serious safety concern."  *Sloan*, 2017 U.S. Dist.

27   LEXIS 120851, *21.  Similarly, plaintiffs' allegations about "bucking," a "loud[] ticking noise,"

28   "knocking," and "gurgling" (FAC, ¶¶ 24, 34, 35, 48, 53, 60) do not show an unreasonable safety

16

hazard, but instead show *advance warnings* of possible high oil consumption that potentially could be corrected free-of-charge under the powertrain warranty or the SCAs long before there is any potential sudden engine failure.

Although plaintiffs in this case plead that these warnings may malfunction, only one of them (Ms. Miranda) alleges an engine shutdown due to low oil quantity, and it appears that more than allegedly excessive oil consumption was at issue in this single incident since complete engine replacement, not just new rings and pistons, allegedly would be necessary to repair her vehicle.  FAC, ¶ 56.  (Although Ms. Maryanski alleges a momentary stall—cause unknown—she was able to restart her vehicle and proceed safely to her destination.  *Id.*, ¶ 62.)

In short, this case is on "all fours" with *Williams* and *Sloan*.  There was no plausibly imminent safety concern when plaintiffs' vehicles were initially sold new by GM dealers and therefore GM had no duty to disclose.  *Twombly*, 550 U.S. at 570 (2007).

### 2. Plaintiffs Do Not Adequately Plead GM's Knowledge of the Purported Defect Before the Initial Sale of Their Vehicles

To plead a duty to disclose plaintiffs must allege not only an unreasonable safety hazard, but one known to GM at the time of sale.  *Grodzitsky v. Am. Honda Motor Co.*, 2013 U.S. Dist. LEXIS 33387, *16, 2013 WL 690822 (C.D. Cal. Feb. 19, 2013) (emphasis added), citing *Wilson*, 668 F.3d at 1143-46; *Sloan*, 2017 U.S. Dist. LEXIS 120851, *16-17 ("defendant [must have been] aware of the defect at the time of sale to establish … a duty to disclose"); *see also Resnick*, 2017 U.S. Dist. LEXIS 67525, *49-50, *52 (pre-sale knowledge allegations were insufficient because they involved "an insufficiently small number of complaints, complaints posted in forums unrelated to the defendant, complaints made after the sale dates, or some combination of those circumstances," citing *Williams*, 851 F.3d at 1027 n. 8).

Here, ***none*** of the complaints cited by plaintiffs was posted on the internet before Mr. Hindsman, Ms. Peterson, Ms. Miranda or Ms. Maryanski purchased their vehicles.  In fact, the NHTSA postings plaintiffs quote were all posted *in 2017* (except one each in 2015 and 2016).  FAC, ¶ 123, pp. 24-32.  The other 21 online complaints on a third-party website were posted in 2015 or later, except for two complaints posted in 2012, one in 2013 and two in 2014, after Mr.

17

Hindsman and Ms. Maryanski purchased their vehicles in January 2010 and February 2012. *Id.*, pp. 32-38.  Only one of these complaints was posted before plaintiff Peterson purchased her 2013 Equinox new in December 2012 (it was posted in November 2012) and none was posted before Mr. Andrews' vehicle was sold new during the 2012 model year. *Id.*  These complaints plainly do not show that GM was aware of the alleged defect or claimed safety risk at the times it was marketing and distributing plaintiffs' vehicles for sale by GM dealers.  Further, the three plaintiffs who purchased used vehicles do not allege any pre-purchase contact at all with GM that would have provided an occasion for disclosure – in fact, two of them bought from non-GM dealers.

Similarly, the "service bulletin" cited by plaintiffs (which is actually part of the SCA for 2011 model year vehicles) was not issued until July 2015 and was posted on the NHTSA website at that time.  FAC, ¶¶ 111-14 & Exh. 4; RJN, Exhs. J & L.  (The SCA for 2010 model vehicles had been issued earlier, in March 2014.  FAC, ¶¶ 25-26; RJN, Exh. I)

Finally*,* plaintiffs' generalized allegations about unspecified "pre-release testing data," "early consumer complaints," "testing conducted in response to those complaints," and "aggregate data from GM dealers" (FAC, ¶ 73) do not plausibly show that GM knew about the alleged defect before January 2010, let alone that it knew of any unreasonable safety hazard. Numerous decisions have rejected similar conclusory allegations. *E.g.*, *Wilson*, 668 F.3d at 1147 & cases cited ("The allegation that [Hewlett-Packard] … had 'access to the aggregate information and data regarding the risk of overheating' is speculative and does not suggest how any tests or information could have alerted HP to the defect'").  Indeed, in *Herremans v. BMW of North America, LLC*, 2014 U.S. Dist. LEXIS 145957, *54-55 (C.D. Cal., Oct. 3, 2014), Judge Morrow rejected allegations that are almost the same as those made here:

> Herremans' … general reference to "internal testing, records of customer complaints, dealership repair records" as other internal sources" provides little, if any, factual foundation for her conclusion that BMW knew of the defect. … Herremans references "pre-release testing data, warranty data, customer complaint data, and replacement part sales data" and "other internal sources of aggregate information about the problem."  This allegation is similarly conclusory and deficient because it does not plausibly indicate that BMW knew of the defect prior to the time it distributed the class vehicles.

18

Thus, none of plaintiffs' allegations plausibly shows that GM knew about the alleged

defect or any claimed safety risk at the time it was marketing and distributing plaintiffs' vehicles

to GM dealers for new retail sale.[7]

### B.  Plaintiffs Fail To Adequately Allege Reliance and Causation

Separately, the claimed existence of a duty to disclose does not, standing alone, give rise

to an actionable non-disclosure claim.  To plead a *material* non-disclosure under Rule 9(b),

plaintiffs must also show causation, *i.e.*, that "had the omitted information been disclosed, one

would have been aware of it and behaved differently."  *Mirkin v. Wasserman*, 5 Cal. 4th 1082,

1093 (1993).  In *Davidson*, the Court held that plaintiffs' omissions allegations were "too vague"

to satisfy Rule 9(b) because they did not "allege that they reviewed or were exposed to *any*

information, advertisements, labeling or packaging by Defendant."  2017 U.S. Dist. LEXIS

36524, *29-31, (emphasis in original), citing *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK,

ECF No. 48, pp. 9-10 (N.D. Cal. Feb. 13, 2015) (dismissing complaint because plaintiffs did not

specify what materials they "viewed  prior to purchasing their cars" and instead alleged only

generally that they reviewed "Ford's promotional materials and other information").  The same is

true here:  plaintiffs do not allege that they reviewed or were exposed to *any* information or

advertisements by GM concerning their Equinoxes.  Indeed, the three used car purchasers

(Andrews, Miranda and Maryanski) do not allege *any* pre-purchase contact at all with GM that

could have provided an opportunity for disclosure. *See Parenteau v. GM, LLC*, 2015 U.S. Dist.

LEXIS 31184, *19, 2015 WL 1020499 (C.D. Cal. March 5, 2015) (dismissing used vehicle

purchasers claims for failure to allege "any contact with [GM] (as opposed to the dealer) prior to

purchasing the vehicle where omissions regarding the defect at issue should or could have been

revealed" and failure to "allege with any specificity which advertisements, offers, or other

representations she relied on that failed to include the omitted information."

---

[7]  Plaintiffs also cite 26 complaints about oil consumption and stalling in model year 2006
through 2009 Equinoxes. FAC, ¶ 124.  This is a red herring.  These vehicles, manufactured by
the former General Motors Corporation, had a completely different *3.4 liter* engine, complaints
about which show absolutely nothing about GM's knowledge, or lack of knowledge, of the
claimed "Oil Consumption Defect" in the *2.4 liter* engines of model year 2010-13 Equinoxes.

19

1      Thus, all of plaintiffs' nondisclosure claims fail for want of particularized facts showing

2    the essential elements of reliance and causation.

3              **C.**       **Plaintiffs Do Not Plead Facts Showing Concealment**

4      Plaintiffs allege that "GM actively concealed and failed to disclose the Oil Consumption

5    Defect to Plaintiffs … at the time they purchased … their [Subject] Vehicles and thereafter."

6    FAC, ¶ 15.  This and similar allegations (*id*., ¶¶ 16, 117, 138, 141) are completely conclusory and

7    do not include the "specific substantiating facts" or "affirmative acts of concealment" that Rule

8    9(b) requires to plead "active concealment" of the alleged defect.  *Taragan*, 2013 U.S. Dist.

9    LEXIS 87148, *21-25; *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1134 (N.D. Cal. 2010) ("a

10   plaintiff cannot establish a duty by pleading, in a purely conclusory fashion, that a defendant was

11   in a superior position to know the truth about a product and actively concealed the defect"); *Gray*

12   *v. Toyota Motor Sales, U.S.A.*, 2012 U.S. Dist. LEXIS 15992, *26-28, 2012 WL 313703  (C.D.

13   Cal. Jan. 23, 2012), aff'd 554 Fed. Appx. 608 (9th Cir. 2014) ("[I]f mere nondisclosure

14   constituted 'active concealment,' the duty requirement would be subsumed and any material

15   omission would be actionable.  This is not the law.").

16      Further, the specific facts plaintiffs do allege – the mailing of the Special Coverage

17   Adjustment notices to owners and posting on the internet – show *disclosure* to consumers, not

18   concealment.  *See* FAC,  ¶¶ 25-26, 38-39 & Exh. 1; RJN, Exhs. I, J, K & L.

19  **III.**     **THE IMPLIED WARRANTY CLAIMS FAIL ON MULTIPLE GROUNDS**

20              **A.**      **No GM Implied Warranty Covers Plaintiffs Who Bought Used Vehicles**

21      Under California law, "every sale of consumer goods … sold at retail … is accompanied

22   by the manufacturer's and the retail seller's implied warranty that the goods are merchantable."

23   Cal. Civ. Code § 1792.  "Consumer goods" are defined as "any *new* product."  *Id.* § 1791(a)

24   (emphasis added).  Implied warranties for *used* consumer goods do not include a manufacturer's

25   implied warranty, but only an implied warranty by the "distributor or retail seller."  *Id.* § 1795.5;

26   *see Johnson*, 2017 U.S. Dist. LEXIS 174573, *19 ("The plain language of [§ 1795.5] clearly only

27   creates [implied warranty] obligations on behalf of the distributor or retail seller making express

28   warranties with respect to used consumer goods (and *not the original manufacturer…*)")

1   (emphasis in original).   Mr. Andrews, Ms. Miranda and Ms. Maryanski purchased their vehicles

2   from an independent used car dealer, a Nissan dealer and an independently-owned GM dealer,

3   respectively, and thus cannot sue GM for unmerchantability because it did not issue implied

4   warranties to them.  FAC, ¶¶ 32, 51, 58.

5           **B.**     **Plaintiffs Hindsman and Peterson Do Not Allege a Breach Within the**

6                   **Implied Warranty Period**

7           The implied warranty of merchantability does not "require[] that goods precisely fulfill

8   the expectation of the buyer," but merely guarantees a minimum level of quality.  *American*

9   *Suzuki Motor Co. v. Superior Court,* 37 Cal. App. 4th 1291, 1295-96 (1995).  Thus, a plaintiff

10  must allege that his vehicle "did not possess even the most basic degree of fitness for ordinary

11  use," *Mocek v. Alfa Leisure, Inc.,* 114 Cal. App. 4th 402, 406 (2003), *i.e.*, "manifest[ed] a defect

12  that is so basic it render[ed] the vehicle unfit for its ordinary purpose of providing transportation,"

13  *American Suzuki*, 37 Cal. App. 4th at 1296, or "'drastically undermine[d] [its] ordinary

14  operation," *Avedisian*, 43 F. Supp. 3d at 1079 (citation omitted).

15          The unmerchantability claims of Ms. Peterson and Mr. Hindsman fail because, as in

16  *Resnick v. Hyundai Motor Am., Inc.* 2017 U.S. Dist. LEXIS 139179, *36 (C.D. Cal. Aug. 21,

17  2017) (*Resnick II*), their allegations do not show their vehicles were "ever inoperable, useless, or

18  unsafe" and, as in *Lee*, 992 F. Supp. 2d at 980, their allegations do not show they were forced to

19  stop driving their vehicles.  *See Kent v. Hewlett-Packard Co.,* 2010 U.S. Dist. LEXIS 76818, *12

20  (N.D. Cal. Jul. 10, 2010).  To the contrary, their allegations show that they have been able to

21  operate their five- and eight-year-old vehicles normally for 115,082 miles (Hindsman) and

22  160,000 miles (Peterson) by monitoring their engine oil levels.  FAC, ¶¶ 30-31, 49-50.

23          Further, neither plaintiff alleges any engine malfunction within the implied warranty

24  period of one year from the date of sale.  *See* FAC, ¶¶ 20, 24, 44, 48; Cal. Civ. Code § 1791.1(c);

25  *Valencia*, 119 F. Supp. 2d at 1139 ("[t]he majority of cases … hold that the Song-Beverly Act

26  requires the alleged defect to manifest within the … implied warranty period"), citing *Marchante*

27  *v. Sony Corp. of America, Inc.*, 801 F. Supp. 2d 1013, 1021-22 (S.D. Cal. 2011); *Peterson v.*

28  *Mazda Motor of Am., Inc.*, 44 F. Supp. 3d 965, 969-72 (C.D. Cal. 2014); *McVicar v. Goodman*

21

1  *Global, Inc.*, 1 F. Supp. 3d 1044, 1057-58 (C.D. Cal. 2014); *Grodzitsky v. Am. Honda Motor Co.*,

2  2013 U.S. Dist. LEXIS 82746, *23-26, 2013 WL 2631326, *10-11 (C.D. Cal. Jun. 12, 2013); and

3  *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 852-53 (N.D. Cal. 2012).[8]

4  **C.      The Implied Warranty Claims Are Barred by the Statute of Limitations**

5         The four-year limitations period of Cal. Coml. Code § 2725 applies to implied warranty

6  claims under the Song-Beverly Act.  *Valencia*, 119 F. Supp. 3d at 1411.  Under section 2725, the

7  cause of action "accrues when the breach occurs, *regardless of the aggrieved party's lack of*

8  *knowledge of the breach*.  A breach of warranty occurs *when tender of delivery is made*, except

9  that where a warranty explicitly extends to future performance of the goods and discovery of the

10  breach must await the time of such performance, the cause of action accrues when the breach is or

11  should have been discovered."  *Id.*, § 2725(2) (emphasis added).  Courts consistently hold that

12  implied warranties *do not* "'explicitly extend[] to future performance of the goods.'"  *MacDonald*

13  *v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1100 (N.D. Cal. 2014), quoting *Cardinal Health 301,*

14  *Inc. v. Tyco Electronics Corp.*, 169 Cal. App. 4th 116, 131 (2008); see also *Philips v. Ford Motor*

15  *Co.*, 2016 U.S. Dist. LEXIS 58954, *40-42 (N.D. Cal. May 3, 2016); *In re Takata Airbag Prods.*

16  *Liab. Litig.*, 2016 U.S. Dist. LEXIS 138976, *177-78, 180-81 (S.D. Fla. Sept. 30, 2016).  Thus,

17  the limitations period on implied warranty claims begins running at "the tender of delivery."

18         Implied warranties arise from the sale of "consumer goods," including new vehicles.  *See*

19  Civ. Code §§ 1791(a), 1792.  Thus, when Hindsman took delivery of his new model year 2010

20  Equinox in January 2010 (FAC, ¶ 20), he received a GM express warranty and an implied

21  warranty under Song-Beverly.  Since the implied warranty did not, as a matter of law, "explicitly

22  extend[] to future performance" of the vehicle, his cause of action accrued upon delivery in

23  January 2010 and the four-year limitations period expired in January 2014, long before he filed

24

25  _____

26  [8] To be sure, Judge Gilliam acknowledged a contrary minority view that a defect that exists
    during the implied warranty period but is not discovered until after it has expired may be

27  actionable, *see Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1304-05 (2009), but he
    correctly limited the *Mexia* holding to a product that is "unmerchantable the very moment it was

28  purchased." 119 F. Supp. 3d at 1139-40.  Here, where the allegedly excessive oil consumption
    arises from piston ring wear that develops over time, *Mexia* simply does not apply.

1   this suit.  The same is true of Ms. Peterson's implied warranty claim.  She purchased her new

2   2013 Equinox in December 2012, more than four years before she joined this suit.

3       Plaintiffs' tolling allegations do not defeat the bar of limitations under section 2725.  First,

4   as discussed above, the discovery rule simply does not apply.  Second, plaintiffs' conclusory

5   allegations of concealment  (FAC, ¶¶ 138-43) do not satisfy their burden to defeat the bar of

6   limitations.  *Investors Equity Life Holding Co. v. Schmidt*, 195 Cal. App. 4th 1519, 1533 (2011).

7   To do so, they must "plead *with particularity* the facts giving rise to the fraudulent concealment

8   claim" and show they "used due diligence in an attempt to uncover the facts."  *Philips*, 2016 U.S.

9   Dist. LEXIS 58954, *45 (emphasis added), citing *Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063,

10  1071 (S.D.Cal. 2015), and *Investors Equity*, 195 Cal. App. 4th at 1533.  Plaintiffs do not plead

11  particularized—or any—facts showing these elements.  Instead, they allege simple non-

12  disclosure, which does not suffice.  *Gray*, 2012 U.S. Dist. LEXIS 15992, *26 ("[I]f mere

13  nondisclosure constituted 'active concealment,' the duty requirement would be subsumed and any

14  material omission would be actionable.  This is not the law."); *Resnick II*, 2017 U.S. Dist. LEXIS

15  139179, *39 (plaintiff alleging fraudulent concealment "'must establish that its failure to have

16  notice of its claim was the result of affirmative conduct by the defendant'") (citation omitted).

17      Finally, tolling based on "estoppel" requires allegations of "reliance by the plaintiff on the

18  words or actions of the defendant that repairs will be made."  *Cardinal Health*, 169 Cal. App. 4th

19  at 134.  Here, plaintiffs do not allege any assurance that repairs would be made.  FAC, ¶¶ 144-46.

20  To the contrary, Mr. Hindsman, Ms. Miranda and Ms. Maryanski were told that free repairs

21  *would not be made* (FAC, ¶¶ 28, 56, 63), Ms. Peterson *never requested repairs* (*id*., ¶¶ 46-50) and

22  Mr. Andrews *declined the opportunity for repairs* (*id*., ¶¶ 40-41 & Exh. 2).

23  **IV.   THIS COURT LACKS JURISDICTION OF CLAIMS BY NON-RESIDENTS**

24  **WHO DID NOT BUY VEHICLES IN CALIFORNIA**

25      All of the plaintiffs reside in California and purchased their vehicles here, but they purport

26  to bring their First and Fifth Causes of Action on behalf of a proposed class including residents of

27  49 other states who, with possible rare exceptions, did not purchase vehicles in California.  Courts

28  have repeatedly held that in-state plaintiffs lack standing to assert claims under other states' laws.

1  *E.g.*, *Johnson*, 2017 U.S. Dist. LEXIS 174573, *8-12 (standing issues can properly be considered

2  prior to class certification and the Court may (and in *Johnson* did) "require that plaintiffs present

3  named class representatives who possess individual standing to assert each state laws' claims."

4  *Id.*, citing *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1075 (N.D. Cal. 2015) (named plaintiffs

5  did not have standing to assert claims under the laws of states in which they did not reside or

6  make a relevant purchase).  Since standing goes to subject matter jurisdiction, dismissal is

7  required under Rule 12(b)(1).  *Johnson*, 2017 U.S. Dist. LEXIS 174573, *5-6, *8 n. 4.[9]

8        Alternatively, under *Bristol-Myers*, courts in California lack *personal* jurisdiction to

9  adjudicate claims against GM brought by nonresidents who did not purchase vehicles or suffer

10  injury in California.  137 S. Ct. at 1781.  The Court must therefore dismiss plaintiffs' claims

11  asserted on behalf of non-resident members of the proposed nationwide class who did not

12  purchase their vehicles in California.  Although *Bristol-Myers* involved state court jurisdiction,

13  multiple decisions have applied its holding to cases in federal court, including class actions.  For

14  example, in *McDonnell v. Nature's Way Prods., LLC*, 2017 U.S. Dist. LEXIS 177892, *10-12,

15  2017 WL 4864910 (N.D. Ill. Oct. 26, 2017), the Court cited *Bristol-Myers* in dismissing claims

16  that, as in this case, an in-state plaintiff sought to bring on behalf of out-of-state members of a

17  purported class under out-of-state statutes); accord, *Wenokur v. AXA Equitable Life Ins. Co.*, 2017

18  U.S. Dist. LEXIS 162812, *12, n. 4, 2017 WL 4357916 (D. Ariz. Oct. 2, 2017) (under *Bristol-*

19  *Myers*, "[t]he Court … lacks personal jurisdiction over the claims of putative class members with

20  no connection to Arizona…."); *Demedicis v. CVS Health Corp.*, 2017 U.S. Dist. LEXIS 19589,

21  *10-12, 2017 WL 569157 (N.D. Ill. Feb. 13, 2017) (dismissing for lack of specific personal

22  jurisdiction claims that an Illinois plaintiff sought to bring on behalf of out-of-state members of

23  ───────────────

[9]  Numerous other decisions hold that if there is no representative plaintiff from a particular state,
24  claims under that state's laws are subject to dismissal for lack of standing.  *See, e.g., In re Flash
Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1164 (N.D. Cal. 2009); *Fenerjian v. Nongshim
25  Co.*, 72 F. Supp. 3d 1058, 1082-83 (N.D. Cal. 2014); *Pardini v. Unilever United States, Inc.*, 961
F. Supp. 2d 1048, 1061 (N.D. Cal. 2013); *In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d
26  1288, 1309 (N.D. Cal. 2008); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d
1011, 1026-27 (N.D. Cal. 2007); *Mollicone v. Universal Handicraft, Inc.*, 2017 U.S. Dist. LEXIS
27  14125, *26-29 (C.D. Cal. Jan. 30, 2017); *Morales v. Unilever U.S., Inc.*, 2014 U.S. Dist. LEXIS
49336, 2014 WL 1389613, *6 (E.D. Cal. Apr. 9, 2014); *Corcoran v. CVS Health Corp.*, 2016
28  U.S. Dist. LEXIS 99797, *8-9 (N.D. Cal. July 29, 2016); *Real v. New York & Co.*, 2016 U.S.
Dist. LEXIS 180633, *10-11 (S.D. Cal. Dec. 28, 2016).

24

the proposed class under other states' consumer protection statutes); *see also In re Dental Supplies Antitrust Litig.,* 2017 U.S. Dist. LEXIS 153265, *37-38, 2017 WL 4217115, *9 (E.D.N.Y. Sept. 20, 2017) ("The constitutional requirements of due process does not wax and wane when the complaint is individual or on behalf of a class"); *Spratley v. FCA US LLC*, 2017 U.S. Dist. LEXIS 147492, *19-20 (N.D.N.Y. Sept. 12, 2017); *Greene v. Mizuho Bank, Ltd.,* 2017 U.S. Dist. LEXIS 202802, *12 (N.D. Ill. Dec. 11, 2017): *but see Fitzhenry-Russell v. Dr. Pepper Snapple Grp.*, 2017 U.S. Dist. LEXIS 155654, *11-13, 2017 WL 4224723 (N.D. Cal. Sept. 22, 2017) (*held, Bristol-Myers* does not bar the assertion of state law claims by California plaintiffs on behalf of unnamed out-of-state class members whose citizenship "is not taken into account for personal jurisdiction purposes"); *Harrison v. General Motors Co.*, No. 17-3128-CV-S-SRB (W.D. Mo. Sept. 25, 2017) ("[I]t is unclear whether *Bristol-Myers* even applies to federal courts" or to class actions).[10]

## CONCLUSION

For all the foregoing reasons, GM respectfully requests that the Court grant its motion in all respects.

Dated: January 11, 2018        GREGORY R. OXFORD
                               ISAACS CLOUSE CROSE & OXFORD LLP

                               */s/ Gregory R. Oxford*
                               Attorneys for Defendant
                               General Motors LLC

---

[10]  Numerous courts have held that *Bristol-Myers* applies to non-class cases in federal courts. *See, e.g., Ferrari v. Mercedes-Benz USA, LLC,* 2017 U.S. Dist. LEXIS 114271, *4-8 (N.D. Cal. July 21, 2017); *Andrew v. Radiancy, Inc.*, 2017 U.S. Dist. LEXIS 96384, *13, 2017 WL 2692840, *6-7 (M.D. Fla. June 22, 2017); *Jordan v. Bayer Corp.*, 2017 U.S. Dist. LEXIS 109206, *8-11, 2017 WL 3006993, *4 (E.D. Mo. July 14, 2017); *Turner v. Boehringer Ingelheim Pharms., Inc.*, 2017 U.S. Dist. LEXIS 122369, *7-9, 2017 WL 3310696, *2 (E.D. Mo. Aug. 3, 2017).