UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RYAN HINDSMAN, et al.,

        Plaintiffs,

    v.

GENERAL MOTORS LLC,

        Defendant.

Case No. 17-cv-05337-JSC

**ORDER RE: DEFENDANT'S MOTION TO DISMISS**

Re: Dkt. No. 35

      Five named plaintiffs bring this action on behalf of a nationwide class and a California sub-class alleging federal and state express warranty claims, California implied warranty claims, and California consumer and tort law claims against Defendant General Motors LLC ("GM"). (Dkt. No. 34.)[1] Plaintiffs allege that certain of GM's Chevy Equinox 2.4-liter engine vehicles suffer from an oil consumption defect that GM misled consumers about and refused to repair under applicable warranties. GM's motion to dismiss is now pending before the Court. (Dkt. No. 35.)[2] GM argues that Plaintiffs have not pled facts that plausibly state any claim against GM and that each plaintiff, as a California resident, lacks standing to bring suit on behalf of a nationwide class. After carefully considering the parties' written submissions, and having had the benefit of oral argument on March 22, 2018, the Court GRANTS GM's 12(b)(6) motion with leave to amend, except as to the Special Coverage Adjustment express warranty claims brought by plaintiffs Hindsman, Andrews, and Miranda. The Court also concludes that the current named plaintiffs should not proceed on behalf of a nationwide class.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 12, 24, 47.)

United States District Court
Northern District of California

# FIRST AMENDED COMPLAINT ALLEGATIONS

This suit concerns GM's 2010-2017 Chevrolet Equinox 2.4-liter engine vehicles ("the Vehicles").  (Dkt. No. 34 ¶ 1.)

## A.    The Oil Consumption Defect

Motor oil is essential for lubricating and reducing heat in a vehicle's internal combustion engine.  (*Id.* ¶ 2.)  However, vehicles that consume excessive oil may have problems with engine stalling, power loss, jerking, starting fires and other problems.  (*Id.* ¶¶ 10, 72, 75, 97, 104.)  The Vehicles contain manufacturing or design defects which cause them to consume or burn off oil at a high rate, damaging internal engine components ("Oil Consumption Defect").  (*Id.* ¶¶ 3, 98, 100.)  Once the internal components become scarred they must be replaced.  (*Id.* ¶ 101.)

The cause of the Oil Consumption Defect relates to piston rings which sometimes allow oil to escape and thus burn up or cause internal damage elsewhere in the engine.  (*Id.* ¶¶ 4-10.)  The Vehicles have an Oil Life Monitoring System which "gauges engine conditions, revolutions, and temperature, to calculate the expected deterioration in oil quality and [when an oil change is due.]" (*Id.* ¶¶ 7-8.)  This system does not advise drivers of oil levels, further contributing to oil loss and resulting problems.  (*Id.* ¶¶ 7-8, 91-92.)  The Vehicles also have an oil pressure gauge, which illuminates when oil is low.  (*Id.* ¶¶ 9, 93.)  However, the gauge does not illuminate when the oil pressure is low enough to damage the engine, seize, or cause engine failure.  (*Id.* ¶¶ 4, 94, 95.)  The oil consumption cannot be reasonably anticipated, and is dangerous since engine failure can occur at any time while driving.  (*Id.* ¶ 11.)  Some Vehicles may consume up to one quart of oil per 1,000 miles, requiring Plaintiffs and Class Members to purchase additional oil, but even diligent addition will not avert carbon buildup damage.  (*Id.* ¶¶ 12, 95.)

The owner's manuals for the Vehicles warn against driving with low oil pressure, as the engine can become inflamed, posing a risk to drivers and the public.  (*Id.* ¶¶ 102-104.)  Low oil is also unsafe because it can cause vehicles to unexpectedly shutdown, which may lead to accidents or strand drivers.  (*Id.* ¶¶ 105-107.)  Drivers are unable to prevent these safety risks as there are no warning signals before oil levels drop low enough to cause engine shutdown.  (*Id.* ¶ 108.)

All Vehicles were sold or leased with express and implied warranties, including a

Powertrain Limited Warranty, which covers the cost of necessary parts and labor to repair powertrain components, including engines, that are defective in workmanship and materials within the first of five years or 100,000 miles. (*Id.* ¶ 17.) The Limited Warranty begins when the purchaser puts the Vehicle into service. (*Id.*)

Since before 2010, GM knew or should have known about the unsafe Oil Consumption Defect, but it actively concealed and failed to disclose the Defect to Plaintiffs and Class Members (collectively, "Consumers") who bought or leased the Vehicles. (*Id.* ¶¶ 15-16, 73.) GM had notice of the defect from internal sources but has not issued a recall or offered suitable free repairs. (*Id.* ¶¶ 18, 73, 127, 130.) In July 2015, GM offered to repair the Vehicles including "improving piston rings oil and combustion gas control by decreasing the ring end gaps, adding a protective coating increasing the ring radial thickness, and increasing the ring height though Service Bulletin 10058791-504". (*Id.* ¶ 84.) The Service Bulletin requires an oil consumption test before providing a repair, and many Consumers that received notice of the Service Bulletin did not receive a repair. (*Id.* ¶ 114-115.) Often dealerships told Consumers that the Vehicles did not have sufficient oil consumption to require repairs. (*Id.* ¶ 115.) Thousands of Consumers were denied piston ring replacements and other did not even receive notice. (*Id.*) GM maintains that the oil consumption was "normal"; thus, the Vehicles continue to suffer the effects of the Oil Consumption Defect. (*Id.* ¶¶ 128-129.)

GM failed to adequately test the piston rings, and introduced them without advanced knowledge of the defect that was discoverable through testing. (*Id.* ¶¶ 109, 116.) GM has a duty to disclose the Oil Consumption Defect to Consumers because the defect is an unreasonable safety hazard, GM has exclusive knowledge and access to the material facts, and GM has actively concealed the defect. (*Id.* ¶ 117, 138, 140-141.) GM's concealment caused Vehicles to experience the Oil Consumption Defect during the warranty periods, which Consumers could not have discovered with reasonable diligence in any applicable statute of limitation. (*Id.* ¶¶ 16, 99, 135, 139.) Had Consumers known of the Oil Consumption Defect they would have either not bought the Vehicles or paid less. (*Id.*) As a result of GM's failure to conduct sufficient testing and to disclose the Defect, Consumers have expended money to remedy the Oil Consumption

3

Defect.  (*Id.* ¶ 125.)  Consumers reasonably expected that the Vehicles would not consume excessive oil, and by relying on GM's omissions or affirmative misrepresentations they have lost money, property, and Vehicle value.  (*Id.* ¶¶ 13, 19, 142.)

**B.    The Named Plaintiffs**

Plaintiffs are California citizens.  (*Id* ¶ 20, 32, 44, 51, 58.)  Plaintiffs' Vehicles were "designed, manufactured, sold, distributed, advertised, marketed, and warranted by GM" with a New Limited Warranty.  (*Id.* ¶¶ 20, 32, 44, 51, 58.)  None of the Plaintiffs have seen low oil level or pressure indicators illuminate in their Vehicles.  (*Id.* ¶¶ 29, 33, 45, 54, 59.)

**Ryan Hindsman**

In January 2010, Ryan Hindsman purchased a new 2010 model Vehicle.  (Dkt. No. 34 ¶ 20.)  In May, with around 5,000 odometer miles, Mr. Hindsman learned at an oil change that his vehicle was "bone dry."  (*Id.* ¶ 22.)  Learning this, he began to manually add oil and has added 60 to 70 quarts since 2010.  (*Id.* ¶¶ 22, 30.)  Around February 2011 at a Chevrolet dealer oil change, Mr. Hindsman was told his vehicle was over-consuming oil and to use synthetic oil to burn less oil.  (*Id.* ¶ 23.)  A month later in 2011, Mr. Hindsman noticed a "gurgling" sound while driving that improved when he added oil.  (*Id.* ¶ 24.)  He also noticed signs of "spark knock."  (*Id.*)

Around March 2014, Mr. Hindsman received a notice from GM, informing him that "some model 2012[3] year Chevrolet Equinox vehicles, equipped with a 2.4L engine, may exhibit excessive oil consumption . . . due to piston ring wear. . . . If you believe that your vehicle has the condition described above, repairs and adjustments qualifying under this special coverage must be performed by a Chevrolet dealer."  (*Id.* ¶¶ 25-26.)

In spring 2015 with around 80,000 odometer miles, Mr. Hindsman sought repairs per the letter.  (*Id.* ¶ 27.)  At first his vehicle tested for oil over-consumption, then upon retesting performed within normal ranges, and the dealer did not perform repairs.  (*See id.* ¶¶ 27-28.)

**James Andrews**

James Andrews purchased a used 2012 Vehicle on January 14, 2017 with 65,551 miles.

---

[3] Plaintiffs' Exhibit 1, which the FAC identifies as the letter sent to Mr. Hindsman, is actually a May 2017 letter sent to James Andrews for 2012 Chevrolet Equinoxes.  (Dkt. No. 34-1 at 2.)

(*Id.* ¶ 32.) That month, his Vehicle began to "subtly rock back and forth when stopping, and exhibited spark knock. (*Id.* ¶ 34.) In February 2017, these symptoms became worse. (*Id.* ¶ 35.) Mr. Andrews' local mechanic then found that the oil was "over three-quarters . . . consumed . . . only about 1,000 miles since [Mr. Andrews] purchased the vehicle." (*Id.*) This mechanic took the Vehicle to a Chevrolet dealer to be fixed per Service Bulletin SB-10058791-504, but was told there were no recalls, so no repairs were made. (*See id.* ¶ 36.) Mr. Andrews began checking his oil every two or three days. (*Id.* ¶¶ 37, 42.) After noting excessive oil consumption on April 14, 2017 with around 71,000 miles, he contacted GM and thereafter received the same notice as Mr. Hindsman. (*See id.* ¶ 38; Dkt. No. 34-1 at 2.) Mr. Andrews sought repairs under the letter with 73,000 miles on his Vehicle, but when told that his mechanic's observations of low oil were unacceptable and that he, Mr. Andrews, needed to submit his Vehicle for oil consumption testing, he refused. (Dkt. No. 34 ¶ 40.) In a subsequent conversation with GM's Customer Assistance, Mr. Andrews was told that 2000 per one quart of oil was acceptable consumption. (*Id.* ¶ 41.) His Vehicle currently has around 82,403 miles. (*Id.* ¶ 43.)

### Robin Peterson

In December 2012, Robin Peterson purchased a new 2013 Vehicle. (*Id.* ¶ 44.) Eight months later at an oil change, Ms. Peterson was told by a Chevrolet dealer the Vehicle was "burning oil." (*Id.* ¶46.) In January 2016 at an oil change, the same dealership told her that her over average driving caused her low oil. (*Id.* ¶ 47.) A month later, her Vehicle began exhibiting "spark knock," and when she checked the oil she found none on the dipstick. (*Id.* ¶ 48.) Since then, she regularly checks her oil, and has added around 20 quarts. (*Id.* ¶ 49.) Currently, her Vehicle has 160,000 miles. (*Id.* ¶ 50.)

### Diana Miranda

Diana Miranda bought a used 2012 Vehicle from a third-party dealer on January 3, 2015. (*Id.* ¶ 51.) In October 2017 while Ms. Miranda was driving, the Vehicle showed signs of "spark knock," displayed "Emergency Engine Shut Off," and completely shut down. (*Id.* ¶ 53.) She was able to coast to a parking lot, where she found the oil to be gone, though she had changed it less than two months earlier. (*Id.* ¶ 53.) But when she added oil the Vehicle "smoked profusely," and

had to be towed. (*Id.* ¶¶ 55-56.) She towed her Vehicle to a Chevrolet dealer who informed her that the engine would need to be replaced, and that GM would likely cover it. (*Id.* ¶ 56.) However, the dealer finally determined that GM would not cover the repair, and did not provide Ms. Miranda with a quote. (*Id.* ¶¶ 56-57.) At the time her Vehicle had 91,787 miles, and to this day remains inoperable. (*Id.* ¶ 57.)

### Vanessa Maryanski

Lastly, Vanessa Maryanski bought a certified preowned 2011 Vehicle on February 25, 2012 with 5,000 miles. (*Id.* ¶ 58.) Ms. Maryanski became concerned around April 2015 that the Vehicle was over-consuming oil when it began exhibiting "spark knock." (*Id.* ¶ 60.) Since then she has regularly added oil. (*Id.* ¶ 61.) Around summer 2016, while resting at a stoplight, her Vehicle completely shut off, but she was able to restart the Vehicle. (*Id.* ¶ 62.) In July 2017, she sought repairs under the Service Bulletin: the dealer diagnosed many issues, but fixed none pursuant to the Service Bulletin. (*Id.* ¶ 64.)

### PROCEDURAL HISTORY

Plaintiffs filed this action in November 2017. (Dkt. No. 1.) After GM filed a motion to dismiss, the Parties stipulated to allow Plaintiffs to amend their complaint. (Dkt. Nos. 28, 32.) Plaintiffs' First Amended Complaint ("FAC") alleges five claims on behalf of a putative class: two claims for a proposed nationwide class (1) breach of express warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, and (2) breach of express warranty under state common laws; and three claims for a proposed California sub-class (3) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (4) violation of California's unfair competition law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and (5) breach of implied warranties under the California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et* seq. (Dkt. No. 34 ¶¶ 155-215.) Plaintiffs attached to their FAC the May 2017 GM Notice Letter to Mr. Andrews, Mr. Andrews' correspondence with GM, Plaintiffs' attorney's declaration regarding venue, and the July 2015 Service Bulletin as Exhibits 1 through 4 respectively. (Dkt. Nos. 34-1; 34-2, 34-3; 34-4.) Now pending is GM's motion to dismiss for (1) failure to state a claim under Federal Rules of Civil Procedure 12(b)(6), (2) lack of subject matter jurisdiction

under Federal Rules of Civil Procedure 12(b)(1), and (3) lack of personal jurisdiction under Federal Rules of Civil Procedure 12(b)(2). (Dkt. No. 35.)

## LEGAL STANDARD

To survive a Federal Rule of Civil Procedure 12(b)(6) motion, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires more than "a sheer possibility" of misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must be able to "draw the reasonable inference" of the defendant's liability based on a "context-specific" review, "judicial experience and common sense." *Id.* at 678-79. In deciding a 12(b)(6) motion, the court accepts the complaint's factual allegations as true and "construes the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The court may dismiss the claim if the plaintiff does not allege sufficient facts under a valid legal theory. *See Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008).

## ANALYSIS

1. **REQUEST FOR JUDICIAL NOTICE**

The Court must first decide what materials it will consider when determining whether and to what extent the FAC survives GM's motion to dismiss. The general rule is "that courts, when ruling on a motion to dismiss, must disregard facts that are not alleged on the face of the complaint or contained in documents attached to the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). However, the court "may also consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *See Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015) (citations omitted). This is known as incorporation by reference. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010.) The doctrine has been extended "to situations in which the plaintiff's claim depends on the contents of a document . . . even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Knievel*, 393 F.3d at 1076. Furthermore, the Court may take notice of a document's existence without taking notice of a document's disputed facts. *See U.S. v. Corinthian Coll.*, 655 F.3d 984, 999 (9th Cir. 2011); *see*

*also Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 960 (9th Cir. 2010) (noticing articles to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (citation omitted).

As the FAC relies on and alleges the contents of the Vehicle Owner's Manuals (Dkt. Nos. 36-1; 36-2; 36-3; 36-4), the New Vehicle Limited Warranties (Dkt. Nos. 36-5; 36-6; 36-7; 36-8), and the Special Coverage Adjustments and Technical Service Bulletin (Dkt. Nos. 36-9; 36-10[4]; 36-11; 36-12), and none of these documents is disputed, the Court GRANTS GM's request that they be judicially noticed and considered on the motion to dismiss.

In support of its opposition to the motion to dismiss, Plaintiffs ask the Court to judicially notice certain documents. (Dkt. No. 40.) The Court declines to do so. The question on GM's motion to dismiss is whether Plaintiffs' FAC alleges facts that state a plausible claim for relief. *Bell Atl. Corp.*, 550 U.S. at 570. Plaintiffs do not cite any caselaw, and the Court is not aware of any, that allows a plaintiff to meet her pleading burden by relying on documents that are not alleged in, attached to, or even referred to in the complaint. While such documents may be considered by the Court in deciding whether leave to amend should be granted, they cannot defeat the motion to dismiss in the first instance.

## 2.    EXPRESS WARRANTY CLAIMS (FIRST & FIFTH CAUSES OF ACTION)

Plaintiffs make claims for breach of express warranty under the federal Magnuson-Moss Act, as well as under state common laws. "The Magnuson-Moss Act does not include any substantive warranty requirements; it merely provides a federal remedy for breach of warranties under state law. Thus, Magnuson-Moss claims 'stand or fall with [plaintiffs'] express and implied warranty claims under state law.'" *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2017 WL 3283998, at *8 (N.D. Cal. Aug. 1, 2017) (citing *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)).

Two sets of warranties are at issue on Plaintiffs' express warranties claims: the New Vehicle Limited Warranties[5] and the Special Coverage Adjustments.[6] Defendant argues Plaintiffs'

United States District Court
Northern District of California

---

[4] This Service Bulletin also appears as Exhibit 4 to the FAC. (*See* Dkt. No. 34-4.)
[5] These warranties cover individual Vehicle model years 2010-2013.

express warranties claims fail because: (1) the warranties do not cover design defects and that is the defect Plaintiffs have pled; (2) Plaintiffs did not request repairs during the warranty periods; and (3) Plaintiffs have not shown eligibility under the Special Coverage Adjustments ("SCA").

Warranties are interpreted by the same rules as contracts: "clear and unambiguous" provisions are not subject to interpretation questions, but where two constructions are possible the warranty is ambiguous. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015). In contracts of adhesion, ambiguities are resolved against the drafter. *Id.* Whether ambiguity exists is a question of law, and warranties can be created without formal words. *Id.* at 1224; Cal. Civ. Code § 1791.2(b).

## A. New Vehicle Limited Warranties

The Vehicles were sold with New Vehicle Limited Warranties. (*See e.g.* Dkt. No. 36-5.) Under "**Repairs Covered**" the warranties state: "The warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period." (*Id.* at 8.) Under "**Warranty Period**" they state: "The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period." (*Id.*) It further limits the warranty period to "3 years or 36,000 miles, whichever comes first" under "**Bumper-to-Bumper Coverage**" and "5 years or 100,000 miles, whichever comes first" under "**Powertrain Component Warranty Coverage**." (*Id.*) These sections all appear within the same New Vehicle Limited Warranties under the heading "**What is Covered**." (*Id.*) The warranties qualify: "[p]erformance of repairs and needed adjustments is the exclusive remedy under this written warranty . . . ." (*Id.* at 14.)

### 1. The New Vehicle Limited Warranties Cover Only Manufacturing Defects

The New Vehicle Limited Warranties cover defects in "materials and workmanship." (Dkt. No. 36-5 at 8 ("The warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period.").) GM first moves to dismiss the express

---

[6] There are three SCAs, which cover individual Vehicle model years 2010-2012. Plaintiffs do not allege that Plaintiff Peterson received a notice extending the warranty on her 2013 Vehicle. (*See* Dkt. No. 34 ¶¶ 44-50.)

warranty claims on the grounds that warranties for "materials and workmanship" do not cover design defects. *See Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1177 (N.D. Cal. 2017) (excluding design defects from materials or workmanship warranty); *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2017 WL 976048, *11 (N.D. Cal. Mar. 14, 2017) (same); *Troup v. Toyota Motor Co.*, 545 Fed. Appx. 668, 668-69 (9th Cir. 2013) (same); *Bros. v. Hewlett-Packard Co.*, No. C-06-02254 RMW, 2007 WL 485979, *4 (N.D. Cal. Feb 12, 2007) (same); *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015) (recognizing that lower court decisions have excluded design defects from "materials and workmanship" warranties and engaging in analysis that implicitly adopts that position).[7]  As the New Vehicle Limited Warranties cover defects in materials or workmanship they do not cover design defects.

Plaintiffs nonetheless argue that the "Repairs Covered" section of the Warranties is only one subsection of the larger "What is Covered" section, implying that the "materials and workmanship" language is limited and does not extend to the "Powertrain Component Warranty Coverage."  The clear and unambiguous language of the Warranties does not plausibly support Plaintiffs' interpretation as the "Repairs Covered" is the only subsection to describe the types of defects covered.  The "Powertrain" subsection merely specifies the extended warranty period and the covered components, but does not suggest a variation in defect coverage.  Further, *Daniel* does not help Plaintiffs.  There, the warranty warranted against both "materials and workmanship" defects as well as "defects that are introduced during the 'design' process."  The court held that the warranty was therefore ambiguous as to whether it covered design defects.  *Daniel*, 806 F.3d at 1224-24.  No such ambiguity is present here: the warranties are limited to "materials or workmanship" and make no mention, ambiguous or otherwise, of design.

Plaintiffs also argue that through language in a Technical Service Bulletin GM admitted the Oil Consumption Defect is covered by the New Vehicle Limited Warranties.  Specifically, the Bulletin states that it was "revised to . . . update the Warranty information."  and lists labor codes

---

[7] A minority view was expressed in *Stearns v. Select Comfort Retail Corp.* where the court in *dicta* read "workmanship" broadly to include decisions made at the design level, and so included both manufacturing and design defects.  *See Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1148 (N.D. Cal. 2010).  The Court does not find *Stearns* persuasive.

for "vehicles repaired under warranty." (Dkt. No. 40-4 at 3, 7.) The Bulletin, however, is not alleged in, referred to, or attached to the FAC; thus, it is not proper for the Court to consider it in determining whether *Plaintiffs* have met their burden in pleading facts that plausibly suggest the warranties cover the Oil Consumption Defect.

Plaintiffs also reference language from the Special Coverage Service Bulletin that GM asked the Court to judicially notice because Plaintiffs referred to it in the complaint. That language states: "if the reimbursement request is approved, the dealer should immediately . . . submit an appropriate warranty transaction . . . ." (Dkt. No. 36-9 at 3.) And Plaintiffs reference another Special Coverage Service Bulletin attached to the FAC that states: "This special policy covers repairs after the original powertrain warranty has expired. For vehicles still covered under the original powertrain warranty, [use alternative labor codes]." (Dkt. No. 34-4 at 3.) Plaintiffs argue that this language shows that the Oil Consumption Defect is covered under the New Vehicle Limited Warranty. Neither Special Bulletin, however, plausibly suggests that the New Vehicle Limited Warranty covers design defects; at most, they suggest that GM believed the defect was covered by the warranties for "materials and workmanship." *See Parenteau v. GM, LLC*, No. CV 14–04961–RGK (MANx), 2015 WL 1020499, *10 (C.D. Cal. Mar. 5 2015) (holding that an article by GM contemplating that the Oil Consumption Defect may be covered "under warranty," "indicates that Defendant itself viewed the defect as a manufacturing defect"). It is also plausible that the Oil Consumption Defect is not covered by the New Vehicle Limited Warranty but that GM chose to nonetheless offer free repairs through the Special Bulletin and that the original labor codes were used as an accounting mechanism. Thus, Plaintiffs do not allege facts that plausibly suggest that the New Vehicle Limited Warranties cover design defects.

### 2. *Plaintiffs do not Allege a Manufacturing Defect*

GM next argues that Plaintiffs have not pled a "materials and workmanship" defect, that is, a defect covered by the New Vehicles Limited Warranty. The Court agrees. "Material and workmanship" defects are synonymous with manufacturing defects. *See Daniel*, 806 F.3d at 1224-25 (warranty covered a "manufacturing defect in factory-supplied materials or factory workmanship" and the court characterized the warranty as covering "manufacturing defects").

Under California law, a manufacturing defect is one that: (1) "differs from the manufacturer's intended result or" (2) a product that "differs from apparently identical products from the same manufacturer." *Johnson*, 272 F. Supp. 3d at 1177 (defining a manufacturing defect in the context of a "materials and workmanship" warranty); *see also Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 429 (1978) (describing a manufacturing defect in the context of strict products liability); *Davidson*, 2017 WL 976048, *11 (quoting the manufacturing defect definition from *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002), a strict products liability case in the express warranty context); *Brothers*, 2007 WL 485979, *4 (citing *McCabe* in express warranty context).

Plaintiffs make five allegations regarding the Oil Consumption Defect:

1. The piston rings are too thin to "maintain sufficient tension to seal oil in the crank case;"

2. The spray jets overload and foul piston rings by spraying oil onto the piston skirt and cylinder wall, causing further loss of oil seal;

3. The Positive Crankcase Ventilation system vacuums oil "from the valve train into the intake system;"

4. The Oil Life Monitoring System fails to monitor oil levels; and

5. The dashboard oil pressure gauge and canister fail to indicate when oil pressure falls low enough to cause internal engine damage.

(Dkt. No. 34 ¶¶ 4-9.) None of these alleged defects, considered separately or together, plausibly suggests the Vehicles suffer from a manufacturing defect; that is, a difference from the manufacturer's intended design or a deviation among products. Rather, the allegations describe design decisions that cause the Vehicles to over-consume oil.

The district court's decision in *Johnson v. Nissan* is distinguishable. There the court concluded that the plaintiffs had plausibly alleged that the vehicles "differ from the product the manufacturer intended to sell" because the tempering *process* during manufacturing compromised the glass in the sunroof, causing some to explode and the plaintiffs had therefore alleged a manufacturing defect. 272 F. Supp. 3d at 1177. Here, in contrast, Plaintiffs have not pled any

such defect during the manufacturing process.  Rather, the Oil Consumption Defect as pled by Plaintiffs is analogous to the defect alleged in *Davidson*, where the plaintiffs alleged that the choice of external materials was insufficient to protect an iPhone's internal parts.  *See Davidson*, 2017 WL 976048, *11 (concluding  the plaintiffs alleged only a design defect); *see also Sloan*, 2017 WL 3283998, at *8 (holding that allegations that GM's decision to include certain piston rings in several engine models caused oil loss alleged a design defect rather than a manufacturing defect).

Plaintiffs next reference a GM TeckLink article to show that the defect is a "materials" defect.  (*See* Dkt. No. 40-1 at 8) ("**Piston Ring Coating** The top compression ring in the new kit has a more robust coating on it that is designed not to wear as quickly as the original coating").  The article, however, is not alleged in, referred to, or attached to the FAC; thus, it is not proper for the Court to consider it in determining whether Plaintiffs have plausibly pled a design defect.

Finally, to support their argument that they have sufficiently alleged a manufacturing defect, Plaintiffs identify several instances where the FAC asserts in boilerplate fashion that the Vehicles suffer from a design defect and/or a manufacturing defect.  (*See* Dkt. No. 34 ¶¶ 3, 71, 140, 152, 187, 205 ("The Class Vehicles contain one or more design and/or manufacturing defect."))  These conclusory allegations do not state "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.*, 550 U.S. at 570.

In sum, as the New Vehicle Limited Warranties cover only manufacturing defects, and as the FAC does not allege facts that support a plausible inference that the Vehicles suffered from such a defect, the express warranties claims premised on the New Vehicle Limited Warranty fail.

### 3. *Required Performance*

GM also argues that Plaintiffs have not alleged that they requested repairs within the New Vehicle Limited Warranties period.

Warrantors must abide by the terms of the warranty within the express warranty period, i.e. the period in which the warranty will cover repairs.  *See* Cal. Civ. Code § 1793.2(a)(1)(A).  The New Vehicle Limited Warranties have two warranty periods.  The Bumper-to-Bumper Coverage extends for "3 years or 36,000 miles, whichever comes first," and the Powertrain Coverage

extends for "5 years or 100,000 miles, whichever comes first." (*E.g.* Dkt. No. 36-5 at 8.) As Plaintiffs allege their Vehicles were defective generally, the Court need only consider the lengthier Powertrain Coverage warranty period covering the first three component defects. Further, the Warranties states: "[t]o obtain repairs, take the Vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs." (*Id.*)

Mr. Hindsman did not request repairs until after the warranty period. He purchased his Vehicle in January 2010 (winter), but did not request repairs until five years later, in the spring. (Dkt. No. 34 ¶¶ 20, 27.) Mr. Hindsman's oil changes at Chevrolet dealerships are not sufficient "request[s]" under the Warranty's terms. (*See id.* ¶¶ 23; 36-5 at 8.)

Ms. Peterson does not allege that she asked for repairs within the warranty period. (*See* Dkt. No. 34 ¶¶ 44-50.) She only alleges that she took her Vehicle for oil changes at Chevrolet dealers, but this is not sufficient under the terms of the Warranty—she was required to ask for repairs. (*See id.* ¶¶ 46-47; Dkt. No. 36-8 at 5.)

Similarly, Ms. Maryanski did not request repairs until after the warranty period. She purchased her Vehicle certified preowned in February 2012, but did not request repairs until July 2017—more than five years later. (Dkt. No. 34 ¶¶ 58, 64.)

Mr. Andrews bought a used 2012 Vehicle but does not allege the Vehicle's original date of service. (*Id.* ¶ 32.) When he requested repairs in or after April 2017, his Vehicle may have been within the warranty period. (*See id.* ¶¶ 38, 40.) However, without an allegation as to when approximately his Vehicle entered service, the Court cannot conclude that he has plausibly alleged that he requested repairs within the warranty period.

Ms. Miranda bought a used 2012 Vehicle but also does not allege the Vehicle's original date of service. (*See id.* ¶ 51.) Her warranty claim therefore fails for the same reason as Mr. Andrews' claim.

\*    \*    \*

The New Vehicle Limited Warranties cover defects in materials and workmanship, not design defects. As Plaintiffs have not pled facts that plausibly suggest the Oil Consumption Defect is a materials or workmanship defect, the Court GRANTS the motion to dismiss the First

United States District Court
Northern District of California

and Fifth Causes of Action to the extent they are premised on the New Vehicle Limited

Warranties.  An additional ground for dismissal is the failure to plead facts that plausibly suggest

any named plaintiff requested repair of the Oil Consumption Defect during the New Vehicle

Limited Warranty period.

**B.     Special Coverage Adjustment (SCA)**

GM also moves to dismiss the express warranties claims to the extent they are premised on

the SCAs because: (1) the SCAs are not warranties and (2) Plaintiffs have not shown eligibility

under the SCAs.  The relevant SCA sections read:

> As the owner of a [Vehicle], your satisfaction with our product is very important
> to us.
>
> This letter is intended to make you aware that some [Vehicles] . . . may exhibit
> excessive engine oil consumption . . . due to piston ring wear. . . .
>
> **<u>Do not take your vehicle to your Chevrolet dealer as a result of this letter
> unless you believe that your vehicle has the condition as described above.</u>**
> . . .
>
> If [the Defect] occurs on your [Vehicle] within 7 years and 6 months of the date
> your vehicle was originally placed in service or 120,000 miles, whichever occurs
> first, the condition will be repaired for you at **no charge**. . . .
> . . .
>
> **What You Should Do:** . . . If you believe that your vehicle has the condition
> described above, repairs and adjustments qualifying under this special coverage
> must be performed at a Chevrolet dealer.

(*E.g.* Dkt. No. 34-1 at 2) (emphasis in original).

> *1.     The SCAs are Warranties*

GM first contends that the SCAs are not warranties.  The Magnuson-Moss Act provides:

"[t]he term 'written warranty' means . . . (B) any undertaking in writing in connection with the

sale by a supplier of a consumer product to refund, repair, replace . . . such product . . . ."  15

U.S.C. 2301(6)(B).

GM has not met its burden of showing that the SCAs are not warranties as a matter of law.

The SCAs are in writing, were issued by GM in connection with Vehicles GM manufactured, and

guarantee refund, repair or replacement of the Oil Consumption Defect.  Drawing all reasonable

15

inferences in Plaintiffs' favor, they qualify as warranties.

GM responds that the SCAs are not warranties because they were issued years after the initial sale of the vehicles, and are therefore not an "undertaking in writing in connection with the sale" of the product. *See* 15 U.S.C. § 2301(6)(B). If GM is correct, no consumer would ever have a claim for breach of an express warranty for warranty extensions, or warranties purchased even shortly after the purchase of the product. Unsurprisingly, GM cites no authority to support this assertion. Further, the SCAs make reference to the initial sale of the Vehicles—"within 7 years and 6 months of the date your vehicle was originally placed in service"—thus, the SCAs are in connection with a sale, and accordingly written warranties for purposes of the express warranties claims.

### 2. Eligibility for Repairs

GM next argues that to be eligible for repairs under the SCAs, Plaintiffs were required to submit their Vehicles for oil consumption testing at a GM dealership. The Magnuson-Moss Act does not specify that buyers must perform a certain way to recover under warranty. 15 U.S.C. § 2301 *et seq.* Further, California law only requires that buyers "deliver nonconforming goods to the manufacturer's service and repair facility." Cal. Civ. Code § 1793.2(c).

The SCAs explicitly state if the Vehicle owners believe their Vehicle has the defect, they can take their Vehicle to a Chevrolet dealership for repairs. (Dkt. No. 34-1 at 2.) The SCAs nowhere identify as a condition to repair that the Vehicle fail an oil consumption test. GM nonetheless insists that Plaintiffs were required to submit their Vehicles for oil consumption rate testing to be eligible for free repairs. To make this argument, Defendant relies on three Technical Service Bulletins. (*See* Dkt. Nos. 36-9; 36-10; 36-11.) Specifically, the Bulletins read:

> Determine the rate of oil consumption.
>
> - If the oil consumption test indicates that the rate of consumption is less than 1 quart (0.946L) of oil every 2,000 miles (3,200 km), note the oil consumption rate . . . . No further action is required.
>
> - If the oil consumption test indicates that the rate of consumption is greater than 1 quart (0.946L) of oil every 2,000 miles (3,200 km), note the oil consumption rate . . . and replace the pistons and rings.

(*E.g.* Dkt. No. 36-9 at 2; *see also* Dkt. No. 34 ¶ 111-114.)

GM's reliance on the Bulletins is unpersuasive. The Bulletins specifically read: "GM bulletins are intended for use by professional technicians, NOT a 'do-it-yourselfer'. They are written to inform these technicians of conditions that may occur . . . . If a condition is described, DO NOT assume that the bulletin applies to your vehicle . . . ." (*Id.* 36-9 at 5.) A plausible inference, then, is that the audience for the Bulletins, regardless of who had access to them, was GM's dealerships. GM has not shown as a matter of law that oil consumption testing was a condition to repair of the Oil Consumption Defect under the SCA. Thus, at this early stage of the proceedings, Plaintiffs have plausibly alleged that the SCAs are warranties in which GM promised to perform the repair if the Consumer believes the Vehicle suffers from the Oil Consumption Defect.

The FAC also plausibly alleges that two named plaintiffs requested repairs under the SCAs during the warranty period but were denied. Mr. Hindsman requested repairs in 2015 with 80,000 miles; he had two years and 40,000 miles remaining in the warranty period, but GM denied him a repair. (Dkt. No. 34 ¶¶ 20, 27, 28.) Mr. Andrews requested repairs in 2017 with 71,000 miles; he had two years and 49,000 miles remaining in the warranty period, but GM denied his request, rejecting Mr. Andrews' mechanic's testing. (*Id.* ¶¶ 32, 38, 40.)

Ms. Miranda alleges she requested repair of a total engine failure; she does not allege the total engine failure was caused by the Oil Consumption Defect. Accordingly, she has not alleged facts that support a plausible inference that she was eligible for the SCA repair. (*Id.* ¶¶ 51, 56-57.) Ms. Maryanski requested repairs in 2017: one year remaining in her warranty period, but she was denied. (*Id.* ¶¶ 58, 64.) Plaintiffs do not allege Ms. Maryanski's mileage, so she may have been outside of her warranty period and thus Plaintiffs have not met their burden of alleging facts that plausibly suggest she was denied an eligible warranty repair. Ms. Peterson has not requested repairs, and her Vehicle is not covered by the SCA, with 160,000 miles.[8] (*See id.* ¶¶ 44-50.) Thus, Plaintiffs Hindsman, Andrews, and Miranda have alleged proper eligibility under the SCAs.

_____

[8] Further, Plaintiffs have not alleged that GM has issued an SCA covering 2013 Vehicles.

### 3. *Failure of Essential Purpose*

Plaintiffs also allege that their claims for breach of express warranties are not limited by the exclusive remedy of repair because the warranties "fail in their essential purpose." (*See* Dkt. No. 34 ¶ 210); *see* Cal. Comm. Code § 2719(2) (providing that if a limited warranty fails of its essential purpose, the buyer is entitled to the full range of UCC remedies). "A repair or replace remedy fails of its essential purpose only if repeated repair attempts are unsuccessful within a reasonable time." *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 808 (9th Cir. 1984) (emphasis omitted); *see also RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 547 (9th Cir. 1985) (affirming essential purpose failure when manufacturer could not fix bugs in software); *In Re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 784 (N.D. Cal. 2017) (holding that the plaintiffs had not alleged a failure of essential purpose where there was no allegation that the manufacturer failed to provide a plaintiff with a functional product after more than one opportunity to fix the defect); *Sumer v. Carrier Corp.*, No. 14–cv–04271–VC, 2015 WL 758314, *1 (N.D. Cal. Feb. 20, 2015) (plaintiffs did not allege a failure of essential purpose where manufacturer made repair); *In Re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 969-70 (N.D. Cal. 2014) (no failure of essential purpose when plaintiffs did not present their vehicles for repair).

Plaintiffs have not alleged facts that plausibly suggest the warranties failed of their essential purpose because they do not allege repeated unsuccessful repair attempts. (Dkt. No. 34 ¶¶ 28-29, 40, 56, 63.) Accordingly, to the extent that Plaintiffs plead a breach of express warranty claim that seeks remedies beyond the repair warranty provided for in the SCA, the claim is dismissed.

*     *     *

Plaintiffs Hindsman and Andrews have plausibly alleged that they requested repairs of the Oil Consumption Defect within the SCA warranties period but GM refused to perform the repair. Accordingly, the Court DENIES the motion to dismiss with respect to the SCAs under the first and fifth causes of action for these Plaintiffs. In all other respects, the motion to dismiss the express warranties claims is GRANTED.

//

### 3.      CLRA AND UCL CLAIMS (SECOND & THIRD CAUSES OF ACTION)

Plaintiffs make claims under the California Consumer Legal Remedies Act (CLRA), Cal. Civ. Code § 1770 *et seq.*, and the Unfair Competition Laws (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.* The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" among other violations. *See* Cal. Bus. & Prof. Code §17200 *et seq.* Specifically, the UCL creates "three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). Plaintiffs claim violations of all three UCL prongs. (Dkt. No. 34 ¶¶ 92-95.) "Because the standard for deceptive practices under the 'fraudulent prong of the UCL applies equally to misrepresentation-based claims under the CLRA . . . courts often address these claims in tandem." *Gray v. Toyota Motor Sales, U.S.A.*, 2012 WL 313703 *3 (C.D. Cal. Jan. 23, 2012). Indeed, GM appears to move to dismiss only to the extent the UCL claim overlaps with the CLRA claim, that is, to the extent the claim is based on fraudulent conduct. The Court will therefore address the CLRA and UCL claims together.

The FAC generally alleges that GM made misrepresentations. GM argues that the FAC does not identify any misrepresentations and therefore the fraud claims are based on GM's alleged failure to disclose the Oil Consumption Defect. Plaintiffs do not dispute GM's characterization of their claims; accordingly, the Court will analyze these claims as based on a failure to disclose. **A.**

### Duty to Disclose

To plead a consumer fraud claim for failing to disclose a defect, a plaintiff must allege "(1) the existence of a design defect; (2) the existence of an unreasonable safety hazard; (3) a causal connection between the alleged defect and the alleged safety hazard; and (4) that the manufacturer knew of the defect at the time a sale was made." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025 (9th Cir. 2017); *see also Wilson*, 668 F.3d at 1141 (a manufacturer has a duty to disclose a defect after the product creates an unreasonable safety hazard.) GM contends that

Plaintiffs have not sufficiently pled a safety hazard or GM's knowledge and that therefore the CLRA and UCL claims must be dismissed.

### 1. Unreasonable Safety Hazard

Plaintiffs allege that the Oil Consumption Defect causes Vehicles to unexpectedly shutdown and potentially catch fire, and that the low oil pressure gauge fails to warn drivers in advance. (*See e.g.* Dkt. No. 34 ¶¶ 10-11, 95-96, 104-106.) GM insists these allegations do not plausibly allege a safety hazard because Plaintiffs do not allege that a single engine has ever caught fire or shut down because of the Oil Consumption Defect. However, a consumer need not wait to suffer injury before she is able to challenge a defect as an unreasonable safety hazard, provided she is able to allege a "sufficiently close nexus" between the defect and the hazard. *See Williams*, 851 F.3d at 1028-29; *see also Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 997 (N.D. Cal. 2013) ( holding that the plaintiffs "successfully showed that the alleged defect posed a genuine safety risk because a headlamp flickering or going out at night or in inclement weather could put the car's driver in danger."). Indeed, the allegations here are identical to those made in *Sloan*, where the court concluded that the same oil defect—potentially causing engines to seize and inflame—paired with a failure to warn of low oil sufficiently established both an unreasonable safety hazard and the nexus between the defect and the safety risk. *See Sloan v. General Motors LLC*, 287 F.Supp.3d 840, 870-71 (N.D. Cal. Feb. 7, 2018).

GM's reliance on *Williams* is unpersuasive. There the plaintiffs alleged that the defect "merely accelerates the *normal and expected process* of corrosion in outboard motors" of the Yamaha boats. 851 F.3d at 1028. The court was concerned that holding that premature but otherwise normal wear and tear poses a safety hazard would mean that all outboard motors would eventually pose an unreasonable safety risk. *Id.* The defect alleged here is different. It is not normal but premature wearing of the piston rings; rather, it is wearing that Plaintiffs allege should never occur.

Finally, GM contends that the Oil Consumption Defect cannot pose a safety hazard because consumers are warned that if the Engine Oil Pressure Light activates the consumer should check the oil level. *See Williams*, 851 F.3d at 1029 (holding that the plaintiffs had not plausibly

alleged a safety hazard because, among other reasons, "[t]he loss of steering power, while plausibly hazardous, is a potential boating condition of which Yamaha expressly warns consumers."). Plaintiffs allege, however, that the Vehicles "communicate no visible or audible warnings of destructive oil pressure levels before the engines are damaged, internally seize, or fail altogether." (FAC. ¶ 95.) While the evidence might ultimately prove otherwise, on a motion to dismiss the Court must accept this allegation as true.

### 2. *Pre-sale Knowledge*

Next, GM urges that Plaintiffs have not alleged sufficient facts to plausibly show GM's knowledge of the Defect at the time of sale of the Vehicles. Plaintiffs' opposition contends that Defendant had knowledge of the Oil Consumption Defect in several respects. First, they identify a 2007 TSB. (FAC ¶ 110.) That TSB, however, does not plausibly suggest knowledge of the Oil Consumption Defect because it relates to a different oil leak in different engines of different model year vehicles.

Plaintiffs also cite the July 2015 TSB. (FAC ¶ 111-114 & Ex. 4.) While this TSB identified the Oil Consumption Defect, and therefore supports an inference of GM's knowledge as of its date and for some time preceding, the question is how much earlier. *See, e.g., Parenteau v. GM, LLC*, No. CV 14–04961–RGK, 2015 WL 1020499, *6-7 (C.D. Cal. Mar. 5, 2015) (finding that a 2012 article supported an inference of the defendant's knowledge for 2010 and 2011 sales); *Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 991, 999 (N.D. Cal. 2013) (finding without analysis that 2007 and 2011 TSBs showed knowledge for 2006 sales); *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 899-900 (N.D. Cal. 2015) (finding knowledge 22 months before published TSBs).

The 2015 TSB plausibly supports an inference that GM knew of the Oil Consumption Defect prior to Mr. Andrews' purchase of his used Vehicle in 2017 and Ms. Miranda's purchase of her used Vehicle in January 2015. (Dkt. No. 34 ¶ 32.) However, the remaining three plaintiffs purchased their Vehicles between 2010 and 2012. Even imputing knowledge to GM two years before the July 2015 TSB, none of the remaining three plaintiffs purchased Vehicles within that time frame, and the 2015 TSB itself does not support a plausible inference that GM was aware of

the defect in 2012 or earlier. Thus, Plaintiffs Hindsman, Peterson, and Maryanski have not plausibly alleged Defendant's pre-sale knowledge of the Oil Consumption Defect.

Plaintiffs other arguments are unpersuasive. In their opposition they seek judicial notice of certain TechLink articles and claim that those articles support an inference of pre-sale knowledge. But the articles are not alleged in or attached to the FAC and thus the Court cannot consider them in deciding whether Plaintiffs have satisfied their pleading burden. Their opposition's bare referral to the FAC's allegations regarding consumer complaints is inadequate. Nearly all of the complaints were made after January 2015 and thus do not plausibly support an inference of GM's knowledge of the Defect in 2012 or earlier. The remaining earlier complaints address different vehicles and are too few to support a plausible inference of GM's knowledge.

Thus, Plaintiffs' failure to disclose claims must be dismissed as to all but Mr. Andrews and Ms. Miranda for failure to allege facts that support a plausible inference that GM had knowledge of the Defect prior to Plaintiffs' purchase of their Vehicles.

### 3. *Reliance*

"An essential element for a fraudulent omission claim [under the CLRA and Unfair Competition Law] is actual reliance." *Daniel*, 806 F.3d at 1225.

> To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision. A plaintiff may do so by simply proving "that, had the omitted information been disclosed, one would have been aware of it and behaved differently."

*Id.* at 1225 (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993)). GM argues that Plaintiffs have failed to plausibly allege reliance given that they do not allege ever being exposed to any information or advertisements about their Vehicles. In other words, GM insists that even if GM had disclosed the defect, Plaintiffs have not alleged facts that plausibly suggest they would have learned of the disclosure and thus behaved differently. *See id* at 1227 (noting that an element of reliance in a fraudulent omission case is whether the plaintiff would have been aware of a disclosure by the defendant). In *Daniels*, for example, the summary judgment record conclusively established that the plaintiffs did not view any of the defendant's advertising

materials prior to purchasing their vehicles. The defendant therefore moved for summary judgment on the grounds that the plaintiffs could not prove that they would have been aware of a disclosure by the defendant and therefore could not prove reliance.  *Id.* at 1226.  The Ninth Circuit held that the plaintiffs' evidence "that they interacted with and received information from sales representatives at authorized [defendant] dealerships prior to purchasing" their vehicle was sufficient to support a finding that they would have been aware of  the disclosure of the defect had it been made.  *Id.*

Here, neither Mr. Andrews nor Ms. Miranda—the only plaintiffs to have plausibly alleged GM's knowledge prior to the purchase of their Vehicles—has alleged any facts that plausibly suggest that had GM disclosed the Oil Consumption Defect they would have been aware of the disclosure.  They have not pleaded that they reviewed any advertising materials before purchasing their Vehicles; nor have they alleged that they had specific interactions with GM before purchasing their Vehicles, as did the *Daniels* plaintiffs.  They have not even alleged that they purchased their Vehicles from GM dealerships.  Thus, Mr. Andrews and Ms. Miranda's failure to disclose claims must be dismissed too.

*       *       *

As the plaintiffs other than Mr. Andrews and Ms. Miranda have not adequately pled GM's knowledge of the Defect prior to their purchase of their Vehicles, their CLRA and fraudulent prong UCL claims must be dismissed.  Mr. Andrews and Ms. Miranda have failed to allege facts that plausibly suggest that they would have been aware of a disclosure of the Defect; thus, the failure to disclose claims of Mr. Andrews and Ms. Miranda must also be dismissed.

**4.      IMPLIED WARRANTY CLAIMS (FOURTH CAUSE OF ACTION)**

Plaintiffs, on behalf of the California sub-class, make a claim for breach of implied warranty under the Song-Beverly Consumer Warranty Act.  (Dkt. No. 34 at ¶¶ 198-206.)  Every retail sale of consumer goods in California has an implied warranty of merchantability.  Cal. Civ. Code § 1792.  GM moves to dismiss on various grounds.

**A.      "Consumer goods"**

"Consumer goods" means "any new product" bought, used or leased for "personal, family,

or household purposes." Cal. Civ. Code § 1791(a). The implied warranty extends to "used goods," but "[i]t shall be the obligation of the distributor or retail seller making express warranties with respect to used consumer goods (and not the original manufacturer, distributor, or retail seller)." Cal. Civ. Code § 1795.5(a). In other words, the distributor or retailer is liable for the sale of used products, not the original product manufacturer. *See Johnson v. Nissan North America, Inc.*, 272 F.Supp.3d 1168, 1178-79 (N.D. Cal. 2017). GM moves to dismiss the implied warranty claim to the extent it is brought by Mr. Andrews, Ms. Miranda and Ms. Maryanski as they allege that they purchased used vehicles. (Dkt. No. 34 ¶¶ 32, 51, 58.) As Plaintiffs do not oppose dismissal on these grounds, the implied warranty claims of Mr. Andrews, Ms. Miranda and Ms. Maryanski are dismissed without leave to amend.

**B.     Merchantability**

The implied warranty of merchantability means that the products "[a]re fit for the ordinary purposes for which such goods are used[.]" Cal. Civ. Code. § 2314. Defendant claims that because Mr. Hindsman and Ms. Peterson do not allege that their vehicles were "'ever inoperable, useless or unsafe'" or that they were ever forced to stop driving them they have not alleged that their Vehicles were not fit for the ordinary purposes for which their vehicles were sold. (Dkt. No. 41 at 14.) Plaintiffs do not address this argument in their opposition. (Dkt. No. 39 at 22-24.) Accordingly, the implied warranty claim is dismissed with leave to amend.

**C.     Statute of Limitations**

The four-year statute of limitations of California Commercial Code § 2725 applies to Plaintiffs' Song-Beverly implied warranty claim. *See Valencia v. Volkswagen Grp. of Am. Inc.*, 119 F. Supp. 3d 1130, 1141 (N.D. Cal. 2015). Section 2725 provides that the cause of action accrues when the breach occurs; that is, in the implied warranty context, when the sale is made. *Id.* As Plaintiffs allege that Mr. Hindsman and Ms. Peterson purchased their Vehicles more than four years before they filed their claims, GM contends that the face of the FAC shows that the claim is barred as a matter of law.

Plaintiffs do not dispute that the claims are barred unless tolled. *See* Cal. Comm. Code § 2725(4) (stating that tolling applies to the statute of limitations set forth in that section). They

contend that the implied warranty claims are tolled based on GM's fraudulent concealment of the Defect. To defeat GM's motion based on fraudulent concealment tolling, Plaintiffs must (1) plead with particularity fraudulent concealment of the defect that allegedly breached the implied warranty, and (2) demonstrate that they used due diligence in uncovering the facts relevant to the claim. *See Philips v. Ford Motor Co*., No. 14-CV-02989-LHK, 2016 WL 1745948, at *13 (N.D. Cal. May 3, 2016); *see also Investors Equity Life Holding Co. v. Schmidt*, 195 Cal.App.4th 1519, 1533-34 (2011) (holding that the plaintiff has the burden of proving the timeliness of its claims based on fraudulent concealment).

Plaintiffs have not met their burden of pleading fraudulent concealment. They emphasize that GM "never revealed the existence of the Defect before Plaintiffs' [sic] purchased their respective vehicles." However, as explained above, Plaintiffs have not sufficiently alleged that GM had *knowledge* of the Defect before Mr. Hindsman or Ms. Peterson purchased their Vehicles. It follows then, that GM could not have fraudulently concealed a defect of which it did not have knowledge. The conclusory allegations in paragraph 73 of the FAC do not satisfy Federal Rule of Civil Procedure 9(b).

Plaintiffs make two additional arguments in a footnote, neither of which is persuasive. First, citing *Daniel*, 806 F.3d at 1222, they contend that the statute of limitations is five years rather than four: the one-year duration of the Song-Beverly implied warranty plus the four –year Commercial Code statute of limitations. *Daniel*, however, says no such thing. Second, they contend that Mr. Hindsman and Ms. Peterson's implied warranty claims were tolled by the pendency of the *Parenteau* class action; however, there is nothing alleged in the FAC from which the Court could plausibly draw that conclusion.

*** 

The Song-Beverly implied warranty claims of Mr. Andrews, Ms. Miranda, and Ms. Maryanski are dismissed without leave to amend as all allege that they purchased used cars. The implied warranty claims of Mr. Hindsman and Ms. Peterson, who purchased new cars, are dismissed with leave to amend. The face of the FAC establishes that the claims are barred by the four-year statute of limitations and Plaintiffs have not sufficiently pled fraudulent concealment or

any other basis for tolling.  Further, Plaintiffs failed to address GM's argument that they had not sufficiently alleged that their Vehicles were unfit for their intended purpose.

**5.        STANDING TO PURSUE A NATIONWIDE CLASS**

Each named plaintiff resides in California and purchased his or her Vehicle in California. Plaintiffs' Magnuson Moss express warranty claim (First Cause of Action) and common law express warranty claim (Fifth Cause of Action) are brought on behalf of a nationwide class. As these claims require the application of the state law applicable to each absent class member, GM argues that the named plaintiffs lack standing to bring the claims on behalf of consumers of 49 different states in which no named plaintiff resides.

The Ninth Circuit has not yet addressed whether state law claims brought on behalf of putative class members by named plaintiffs from states different from the putative class must be dismissed based on the named plaintiffs' lack of standing.  The majority of the courts in the Northern District of California have held that such claims should be dismissed for lack of standing.  *See, e.g., Johnson*, 272 F. Supp. 3d 1168, 1175 (N.D. Cal. 2017); *Corcoran v. CVS Health Corp.*, 2016 WL 4080124 *  (N.D. Cal. July 29, 2016); s*ee also In Re Carrier IQ, Inc., Con. Priv. Litg.*, 78 F. Supp. 3d 1051, 1064-65 (N.D. Cal. 2015) (listing cases in support).  There is an argument, however, that the appropriateness of proceeding with state law claims from states in which there is no named plaintiff is more appropriately an issue for class certification.  *See Peacock v. 21st Amendment Brewery Café, LLC*, 2018 WL 452153 *10 (N.D. Cal. January 17, 2018).

At oral argument Plaintiffs conceded that the question of when to address the issue— motion to dismiss or the class certification stage--is one of discretion.  And, if addressed on a motion to dismiss, it may be more appropriately characterized as a question of whether as a matter of discretion the named plaintiff may represent certain putative class members as opposed to whether under Article III of the Constitution the named plaintiff can do so.  *See In re Carrier IQ, Inc.*, 78 F.Supp.3d at 1074.  Assuming, without deciding, that it is a discretionary class representation question, the Court therefore chooses to exercise its discretion to address the question at the motion to dismiss stage.  Resolving the question now as a matter of case

management is consistent with Federal Rule of Civil Procedure 1 which requires the courts to construe the Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding." As the court in *In re Wellbutrin XL Antitrust Litig*., 260 F.R.D. 143 (E.D. Pa. 2009), stated:

> The alternative proposed by the plaintiffs [deferring consideration until class certification] would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint to embark on lengthy class discovery with respect to injuries in potentially every state in the Union. At the conclusion of that discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress would not share. That would present the precise problem that the limitations of standing seek to avoid.

*Id*. at 155. The court refused to "indulge in the prolonged and expensive implications of the plaintiffs' position only to be faced with the same problem months down the road." *Id.*

While there may be cases where it is appropriate to proceed with a nationwide class based on the laws of all 50 states without a named plaintiff from each of those states, this is not one of them. First, the case is a California-centric case. Each of the five named plaintiffs resides in California and purchased their Vehicles in California. Three of the five claims alleged in the FAC are brought under California law only.

Second, there is no named plaintiff from *any* of the other 49 states whose laws are at issue in the First and Fifth Causes of Action. In *In Re Carrier IQ, Inc.*, for example, as a matter of case management, the court held it was not appropriate to proceed with a class action brought on behalf of consumers from 48 states where the named plaintiffs only came from 13 of those states and thus "[t]he number of consumers from 35 other states in which state law claims are asserted is vast relative to the claims to which the named Plaintiffs indisputably have standing." 78 F.Supp.3d at 1074; *see also Johnson*, 272 F.Supp.3d at 1175 (requiring plaintiffs to present named class representatives who have individual claims against the defendant under each state law asserted on behalf of the putative class where there were only two named plaintiffs from two states purporting to bring claims under the laws of all 50 states); *compare with In re Target Corp. Data Sec. Breach Litig.,* 2014 WL 7192478 (D.Minn. Dec. 18, 2014) (permitting class certification to proceed, noting that, "this is not a case where a single named plaintiff asserts the laws of a multitude of

states in which that plaintiff does not reside. Rather, there are 114 named Plaintiffs who reside in every state in the union save four and the District of Columbia.").  Accordingly, the claims on behalf of non-California consumers are dismissed.[9]

## CONCLUSION

For the reasons explained above, the Court rules on GM's motion to dismiss as follows:

- Plaintiffs' express warranty claims (First and Fifth Causes of Action) as to all five plaintiffs are dismissed with leave to amend to the extent they are based on the New Vehicle Limited Warranty because Plaintiffs do not allege facts that plausibly suggest their Vehicles suffered from a manufacturing defect, that is, a defect in workmanship or materials.

- Plaintiffs' express warranty claims (First and Fifth Causes of Action) as to Ms. Peterson, Ms. Miranda and Ms. Maryanski are dismissed with leave to amend to the extent they are based on the SCA.

- Plaintiffs' "failure of essential purpose" warranty claim is dismissed with leave to amend.

- Plaintiffs' UCL and CLRA claims are dismissed with leave to amend.

- Plaintiffs' Song-Beverly implied warranty claims are dismissed without leave to amend as to Mr. Andrews, Ms. Miranda and Ms. Maryanski and with leave to amend as to Mr. Hindsman and Ms. Peterson.

- The claims on behalf of putative class members from states other than California are dismissed without prejudice.

Any amended complaint shall be filed within 30 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: June 1, 2018

_Jacqueline Scott Corley_
_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

---

[9] Since the Court has dismissed the First and Fifth Causes of Action to the extent they are brought on behalf of consumers who do not reside in nor purchased their car in California, it need not address GM's _Bristol-Meyers Squibb Co. v. Sup. Ct. of Cal._ 137 S. Ct. 1773, 1781 (2017), personal jurisdiction argument.