1  GREGORY R. OXFORD (SBN 62333)
   goxford@icclawfirm.com
2  ISAACS CLOUSE CROSE & OXFORD LLP
   21515 Hawthorne Boulevard, Suite 950
3  Torrance, California 90503
   Tel.: (310) 316-1990
4  Fac.: (310) 316-1330

5  Attorneys for Defendant General Motors LLC

6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12  RYAN HINDSMAN and JAMES ANDREWS, on     Case No. 3:17-cv-05337-JSC
    behalf of themselves and all others similarly
13  situated,                                NOTICE OF MOTION AND MOTION
                                             TO DISMISS SECOND AMENDED
14                          Plaintiffs,      COMPLAINT; MEMORANDUM OF
                                             POINTS AND AUTHORITIES
15       v.
                                             Date:    September 27, 2018
16  GENERAL MOTORS LLC,                      Time:    9:00 a.m.
                                             Courtroom F
17                          Defendant.       Hon. Jacqueline Scott Corley
18

19

20  **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

21       **PLEASE TAKE NOTICE** that on September 27, 2017, at 9:00 a.m., or as soon

22  thereafter as counsel may be heard, in the United States District Court, Northern District of

23  California, San Francisco Division, 450 Golden Gate Avenue, Courtroom F, before the Honorable

24  Jacqueline Scott Corley, defendant General Motors LLC ("GM") will move for an order

25  dismissing certain plaintiffs' claims asserted in the Second Amended Complaint pursuant to

26  Rules 8(a)(2), 9(b) and/or 12(b)(6) for failure to state a claim upon which relief can be granted.

27       The motion is based on the annexed memorandum of points and authorities and all other

28  pleadings and papers on file herein.

**STATEMENT OF ISSUES TO BE DECIDED [L.R. 7-4(a)(3)]:**

Should plaintiffs' Second Amended Complaint be dismissed in part under Rules 8(a)(2), 9(b) and 12(b)(6) for failure to state a claim upon which relief can be granted on the following grounds?

(a)     Except for claims based on Special Coverage Adjustments, all of plaintiffs' breach of express warranty claims (First and Fifth Causes of Action) should be dismissed without leave to amend because the GM warranty does not cover design defects.

(b)     Alternatively, (1) the express warranty claims of plaintiffs Hindsman, Miranda and Maryanski should be dismissed without leave to amend because they did not present their vehicles to authorized GM dealers for repairs during the powertrain warranty period – five years or 100,000 miles, whichever came first, after the initial new retail sale or lease of their vehicles; and (2) the express warranty claims of plaintiffs Mitchell and Chambers should be dismissed because they do not allege that they submitted to diagnostic tests that GM dealers needed to determine whether their vehicles were consuming excessive oil, as a result of which GM and its dealers were not given a fair opportunity to provide any *needed* repairs.

(c)     The SCA claims of plaintiffs Miranda and Maryanski should be dismissed for failure to plead facts showing that damage to their engines was the result of excessive oil consumption.

(d)     The SCA claims of new plaintiffs Mitchell and Chambers should be dismissed without prejudice because they did not submit to diagnostic tests that GM dealers needed to determine whether their vehicles were consuming excessive oil, as a result of which GM and its dealers were not given a fair opportunity to provide any *needed* repairs.

(e)     The nondisclosure claims of plaintiff Hindsman under the CLRA and UCL should be dismissed for failure to allege facts showing GM's knowledge of the alleged Oil Consumption Defect before January 2010, when he purchased his model year 2010 Equinox.

(f)     The nondisclosure claims of plaintiffs Maryanski and Miranda under the CLRA and UCL should be dismissed without leave to amend for failure to allege facts demonstrating the essential element of reliance on the alleged nondisclosures.

1        (g)   The only surviving breach of implied warranty claims (Fourth Cause of Action)

2    should be dismissed without leave to amend because plaintiffs Hindsman, Mitchell and

3    Chambers have not alleged facts plausibly showing that their vehicles were unmerchantable

4    during the maximum one-year implied warranty period provided by California's Song-

5    Beverly Act, Cal. Civ. Code §1791.1(c), and, separately, because these claims are barred by

6    the four-year statute of limitations that began running upon the initial new retail sale or lease

7    of their vehicles, *see* Cal. Coml. Code (UCC) § 2725.

1

**TABLE OF CONTENTS**

2

*Page*

3   **PRELIMINARY STATEMENT** ........................................................................ 1

4       **ALLEGATIONS OF THE SECOND AMENDED COMPLAINT** ....... 2

5       A.    **New Allegations by Original Plaintiffs** ................................ 2

6       B.    **The New Plaintiffs** ............................................................... 3

7       C.    **New Allegations Concerning Alleged Defects** ..................... 4

8   **ARGUMENT** ..................................................................................................... 6

9   I.    **THE EXPRESS WARRANTY CLAIMS HAVE MULTIPLE DEFICIENCIES** ... 6

10      A.    **The GM Warranty Does Not Cover the Alleged Design Defects** .. 6

11      B.    **Failure To Request Repairs During the Warranty Period** ... 8

12      C.    **Breach of Warranty Claims Based on the SCAs** ................ 10

13      D.    **Summary of Breach of Express Warranty Claims** .............. 11

14          *1.*    *Alleged Breach of the GM Warranty* ............... 11

15          *2.*    *Alleged Breach of Special Coverage Adjustments* ... 11

16  II.    **THE CLRA AND UCL CLAIMS HAVE MULTIPLE DEFICIENCIES** ..... 12

17      A.    **Plaintiff Hindsman Does Not Adequately Plead GM's Knowledge of the**

18          **Alleged Defect at the Time He Purchased His Equinox in January 2010** ... 12

19      B.    **Plaintiffs Miranda and Maryanski Fail To Adequately Allege Reliance** ... 15

20  III.    **THE IMPLIED WARRANTY CLAIMS FAIL ON MULTIPLE GROUNDS** .. 16

21      A.    **Plaintiffs Do Not Adequately Allege Unmerchantability** ... 16

22      B.    **The Implied Warranty Claims Are Barred by the Statute of Limitations** .. 18

23  **CONCLUSION** ................................................................................................. 21

24

25

26

27

28

**TABLE OF AUTHORITIES**

*Cases*                                                                                    *Page(s)*

*Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063 (S.D.Cal. 2015)                                 19

*American Suzuki Motor Co. v. Superior Court,* 37 Cal. App. 4th 1291 (1995)                     17

*Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071 (C.D. Cal. 2014)                     17

*Cardinal Health 301, Inc. v. Tyco Electronics Corp.*, 169 Cal. App. 4th 116 (2008)          18,20

*Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008)                                6

*Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006)                                 9

*Davidson v. Apple, Inc.*, 2017 U.S. Dist. LEXIS 36524, 2017 WL 976048
    (N.D. Cal. Mar. 14, 2017)                                                                  6,7

*Eisen v. Porsche Cars North America, Inc.*, 2012 U.S. Dist. LEXIS 116836
    (C.D. Cal. Feb. 22, 2010)                                                                   16

*Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843 (N.D. Cal. 2012)                            17

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004)                      7

*Gray v. Toyota Motor Sales, U.S.A.*, 2012 U.S. Dist. LEXIS 15992, 2012 WL 313703
    (C.D. Cal. Jan. 23, 2012), aff'd 554 Fed. Appx. 608 (9th Cir. 2014)                         19

*Grodzitsky v. Am. Honda Motor Co.*, 2013 U.S. Dist. LEXIS 33387, 2013 WL 690822
    (C.D. Cal. Feb. 19, 2013)                                                                   12

*Grodzitsky v. Am. Honda Motor Co.*, 2013 U.S. Dist. LEXIS 82746, 2013 WL 2631326
    (C.D. Cal. Jun. 12, 2013)                                                                   18

*Herremans v. BMW of North America, LLC*, 2014 U.S. Dist. LEXIS 145957
    (C.D. Cal., Oct. 3, 2014)                                                                   14

*Hindsman v. GM LLC*, 2018 U.S. Dist. LEXIS 92319 (N.D. Cal. June 1, 2018)                 *passim*

*Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412 (1945)                                            20

*In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015)                                   2

*In re MyFord Touch Consumer Litig.*, 46 F.3d 936 (N.D. Cal. 2014)                               9

*In re Takata Airbag Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS 138976
    (S.D. Fla. Sept. 30, 2016)                                                                  18

ii

*In re Toyota Motor Corp. Sudden Unintended Acceleration Mktg., Sales Practices*, & *Prods.*
    *Liab. Litig.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010) ........................................... 9

*Investors Equity Life Holding Co. v. Schmidt*, 195 Cal. App. 4th 1519 (2011) .......... 19,20

*Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1169 (N.D. Cal. 2017) ................. 2,5,8

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2008) ....................................... 16

*Lady Washington C. Co. v. Wood*, 113 Cal 482 (1896) ............................................. 20

*Lee v. Toyota Motor Sales, U.S.A., Inc.,* 992 F. Supp. 2d 962 (C.D. Cal. 2014) ............ 18

*MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087 (N.D. Cal. 2014) ........................ 18

*Marchante v. Sony Corp. of America, Inc.*, 801 F. Supp. 2d 1013 (S.D. Cal. 2011) ........ 17

*Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992 (N.D. Cal. 2009) ............................ 16

*McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111 (2002) ................................. 7

*McVicar v. Goodman Global, Inc.*, 1 F. Supp. 3d 1044 (C.D. Cal. 2014) ..................... 17

*Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297 (2009) .................................... 17,18

*Parenteau v. GM, LLC*, 2015 U.S. Dist. LEXIS 31184, 2015 WL 1020499
    (C.D. Cal. March 5, 2015) ......................................................... 15,16

*Peterson v. Mazda Motor of Am., Inc.*, 44 F. Supp. 3d 965 (C.D. Cal. 2014) ................ 17

*Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803 (9th Cir. 1984) .................... 9

*Philips v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 58954 (N.D. Cal. May 3, 2016) ...... 18,19,20

*Resnick v. Hyundai Motor Am., Inc.*, 2017 U.S. Dist. LEXIS 67525
    (C.D. Cal. Apr. 13, 2017) ........................................................ 12,13

*Resnick v. Hyundai Motor Am., Inc.*, 2017 U.S. Dist. LEXIS 139179
    (C.D. Cal. Aug. 21, 2017) ........................................................ 18,20

*Rice v. Sunbeam Products, Inc.*, 2013 U.S. Dist. LEXIS 7467 (C.D. Cal. Jan. 7, 2013) ...... 8

*Sloan v. GM LLC*, 2017 U.S. Dist. LEXIS 120851 (N.D. Cal. Aug. 1, 2017) ................... 12

*Taragan v. Nissan N. Am., Inc.,* 2013 U.S. Dist. LEXIS 87148, 2013 WL 3157918
    (N.D. Cal. June 20, 2013) ........................................................... 19

*Tietsworth v. Sears*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010) .................................. 19

*Trusky v. General Motors Co.*, 2013 Bankr. LEXIS 620 (Bankr. S.D.N.Y. Feb. 19, 2013) ...... 8

1  *Valencia v. Volkswagen Grp. of Am., Inc.*, 119 F. Supp. 3d 1130 (N.D. Cal. 2005)          17,18

2  *Williams v. Yamaha Motor Co.,* 851 F.3d 1015, 1027 n. 8 (9th Cir. 2017)          12

3  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1143-46 (9th Cir. 2012)          12,14

4  ***Statutes and Rules***

5  Cal. Coml. Code § 2316(4)          9

6  Cal. Coml. Code § 2719(1)          9

7  Cal. Coml. Code § 2719(2)          9

8  Cal. Coml. Code § 2725          2,16,18,19

9  Cal. Coml. Code § 2725(2)          18

10  F.R.Civ. P. 9(b)          7,15,19,20

11  Magnuson Moss Act, 15 U.S.C. § 2310(e)          8,10

12  Song-Beverly Act, Cal. Civ. Code § 1791(a)          19

13  Song-Beverly Act, Cal. Civ. Code § 1791.1(c)          17

14  Song-Beverly Act, Cal. Civ. Code § 1792          19

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GM'S MOTION TO DISMISS SECOND AMENDED
COMPLAINT, CASE NO. 3:17-CV-05337-JSC

**PRELIMINARY STATEMENT**

On June 1, 2018, the Court issued its order granting in part and denying in part GM's motion to dismiss plaintiffs' First Amended Complaint. *Hindsman v. GM LLC*, 2018 U.S. Dist. LEXIS 92319 (N.D. Cal. June 1, 2018) ("June 1 Order").

On the First and Fifth Causes of Action, the Court dismissed plaintiffs' claims under the GM Limited New Vehicle Warranty with leave to amend on two separate grounds: (1) the GM warranty covers only defects related to materials and workmanship, not the design defects alleged by plaintiffs; and (2) plaintiffs did not allege that they requested repairs during the warranty period. The Court denied GM's motion to dismiss plaintiff Hindsman's and plaintiff Andrews' claims under GM's Special Coverage Adjustments ("SCAs"), finding that plaintiffs had plausibly alleged that the SCAs constituted express warranties and had alleged repair requests during the special coverage periods. The Court granted GM's motion to dismiss the SCA claims of plaintiffs Peterson, Miranda and Maryanski with leave to amend, finding that Ms. Peterson's model year 2013 Equinox was not covered by an SCA, that Ms. Miranda did not allege that the failure of her engine was caused by the alleged oil consumption defect and that Ms. Maryanski had not alleged that her vehicle's mileage was within the 120,000 mile special coverage period when she requested repairs.

On plaintiffs' Second and Third Causes of Action under the Consumers Legal Remedies Act and Unfair Competition Law, the Court granted GM's motion to dismiss with leave to amend, finding (1) that plaintiffs Hindsman, Peterson and Maryanski had not plausibly alleged GM's knowledge of the alleged oil consumption defect when they purchased their vehicles between 2010 and 2012; and (2) that plaintiffs Miranda and Andrews had sufficiently alleged GM's knowledge of the alleged defect prior to their used vehicle purchases in 2015 and 2017, but had failed to allege facts plausibly showing reliance, *i.e.*, that if GM had disclosed the alleged defect they would have become aware of it prior to purchase.

On plaintiffs' Fourth Cause of Action for breach of implied warranty, the Court dismissed without leave to amend the claims of plaintiffs Andrews, Miranda and Maryanski on the ground that their used vehicles were not covered by any GM implied warranty. Plaintiffs did not oppose

1

1    these dismissals.  The Court dismissed the implied warranty claims of plaintiffs Hindsman and

2    Peterson with leave to amend, finding (1) that they had not alleged that their vehicles were "ever

3    inoperable, useless or unsafe," *i.e.*, unmerchantable; and (2) that their claims were barred by the

4    four-year statute of limitations of Cal. Coml. Code § 2725.

5           Finally, the Court exercised its discretion to dismiss without prejudice the claims of

6    members of the putative nationwide class who reside in other states, citing prior Northern District

7    of California decisions requiring the joinder of a named plaintiff from each state whose laws are

8    invoked.  2018 U.S. Dist. LEXIS 92319, *46-49, citing *In re Carrier IQ. Inc.*, 78 F. Supp. 3d

9    1051, 1074 (N.D. Cal. 2015), and *Johnson v. Nissan North America, Inc.*, 272 F. Supp. 3d 1169,

10   1175 (N.D. Cal. 2017).

11          Plaintiffs now have filed a Second Amended Complaint that abandons the nationwide

12   class allegations, drops plaintiffs Andrews and Peterson, adds two new plaintiffs (Ms. Mitchell

13   and Ms. Chambers) and makes additional allegations.  As discussed below, however, many of the

14   deficiencies identified in the June 1 Order remain.

15                  **ALLEGATIONS OF THE SECOND AMENDED COMPLAINT**

16          A.      **New Allegations by Original Plaintiffs**

17          Mr. Hindsman now alleges that he utilized the GM website to "build" his vehicle and

18   reviewed GM advertisements and marketing materials prior to purchase.  SAC, ¶ 23.  He also has

19   added an allegation that he received an SCA notice from GM in 2014.  *Id*., ¶¶ 28-29.  None of

20   these allegations improves his position vis-à-vis GM's arguments for dismissal.

21          Ms. Miranda now alleges that prior to purchasing her used Equinox she reviewed

22   unspecified GM marketing materials and brochures that "in part, led to her purchase."  SAC, ¶ 36.

23   She also alleges that her vehicle was placed in service on October 3, 2011, confirming that her 5-

24   year powertrain warranty had expired before October 5, 2017, when she experienced a vehicle

25   malfunction allegedly caused by the oil consumption defect.  *Id*., ¶¶ 35, 37.  (As she alleges,

26   however, her vehicle was covered by the SCA at that time, *assuming* that the cause of her engine

27   failure was piston ring wear, which has not been demonstrated.  *Id.*, ¶¶ 37, 40).  Finally, she now

28   says her vehicle is "inoperable, unsafe and useless" due to the October 5, 2017 incident.  *Id.*, ¶ 37.

2

Ms. Maryanski still does not allege that she reviewed any GM advertising, brochures or marketing materials before purchasing her used Equinox. *See* SAC, ¶¶ 43-51.  She also admits that she first requested repairs for the alleged defect in May 2017 at 103,499 odometer miles, after the powertrain warranty had expired. *Id.*, ¶ 48.  (As in the case of Ms. Miranda, however, her vehicle would have been covered by the SCA at that time, as she alleges, *assuming* that the cause of the damage to her engine was piston ring wear, which has not been demonstrated.  To the contrary, the dealership found metal in the engine that could have resulted from myriad other causes. *Id.*, ¶¶ 48, 50.)

## B.    The New Plaintiffs

New plaintiff Rene' Mitchell leased a new 2012 Equinox in February 2013.  SAC, ¶ 52.  She did so after reviewing unspecified GM advertising materials showing the safety features of the Equinox. *Id.*, ¶ 53.  In June 2017, with approximately 62,233 miles on the odometer, her vehicle "shut off unexpectedly" while driving. *Id.*, ¶ 55.  A GM dealership found "accentuator failure" that it repaired by replacing the camshaft actuator solenoid. *Id.*, ¶ 55.[1]  In March 2018, at 69,700 odometer miles, Ms. Mitchell noticed a knocking sound (allegedly "spark knock"), checked her oil level and allegedly found it "completely dry"; she called the dealership and was told to put in 2 quarts of oil to resolve the problem. *Id.*, ¶ 56.  On April 7, 2018, at 69,785 odometer miles, she took the vehicle to the dealer for service and was told that it needed an oil consumption test to determine whether repairs were needed. *Id.*, ¶ 57.  After 1,200 miles of the test, she checked the oil and supposedly "discovered that her vehicle only one half (1/2) of the oil remaining." *Id.*, ¶ 58.  When she took it to the dealer for inspection, the service technicians "refuted the oil level and told her that they were going to need her to finish the Oil Consumption test before … any kind of repair." *Id.*, ¶ 59.  She does not allege that she completed the oil consumption test, however, so the amount of oil her vehicle consumed in 2,000 miles is unknown.  As plaintiff alleges (*id.*, ¶ 60), the vehicle is still within the time and mileage limits for SCA coverage and would have been repaired free-of-charge if the test showed excessive oil use.

---

[1]  Ms. Mitchell alleges she was charged $358.56 for this repair.  SAC, ¶ 55.  If so, it is not clear why the dealership did not provide this repair free-of-charge under the powertrain warranty.

3

1     New plaintiff Brittany Chambers purchased a new 2011 Equinox in approximately June

2  2011, relying in part on safety features described on a GM website and in its advertising.  SAC,

3  ¶¶ 61-62.  In early April 2016, she noticed that the vehicle was running rough at startup and while

4  idling; with 75,954 odometer miles, she took it to a Chevrolet dealer on April 25, 2016 and was

5  told that the throttle body was very dirty; she was charged $527.68 for cleaning it, an oil change

6  and a fuel injector cleaning; the technician then told her that was nothing wrong with her vehicle.

7  *Id.*, ¶ 64.  In mid-December 2016, with 80,911 odometer miles, Ms. Chambers returned to the

8  dealership with the same "running rough" issues; the technician told her there was no oil on the

9  dipstick, but all it needed was a routine oil change that, after it was performed, returned the

10  vehicle to normal operation.  *Id.*, ¶ 65.  In September 2017, Ms. Chambers noticed the vehicle

11  was running rough while idling.  *Id.*, ¶ 66.  On September 7, 2017, with 85,196 odometer miles,

12  she took it to the dealership and was told to start an oil consumption test and to return to the

13  dealership after 2,000 miles.  *Id.*  She was unable to complete the test, however, due to the birth

14  of her first child.  *Id.*, ¶ 67.  In June 2018, she noticed the vehicle was sounding "extremely loud"

15  and was "lurching back and forth."  *Id.*, ¶ 68.  She took it back to the dealer on June 5, 2018, at

16  89,193 odometer miles, and was again asked to start an oil consumption test and bring it back to

17  the dealership at 90,193 miles.  *Id.*  But she does not allege that she completed the test.

18          **C.      New Allegations Concerning Alleged Defects**

19          Plaintiffs have added allegations concerning the July 2012 *TechLink* article mentioned in

20  their previous opposition papers.  *TechLink* is a periodic GM publication directed at dealership

21  technicians and other service personnel.  The July 2012 article noted excessive oil consumption

22  issues only in 2010 Equinox and GMC Terrain vehicles equipped with 2.4 liter engines.  On

23  information and belief, plaintiffs claim the *TechLink* article reproduces information contained in a

24  Technical Service Bulletin published at an unspecified date "prior to July 2012."  SAC, ¶¶ 78-84.

25  From this uncertain premise, plaintiffs conclude "it is reasonable to infer that GM know about the

26  oil consumption defect prior to the sale of each [plaintiff's vehicle] … or prior to January 2010,"

27  two and one-half years earlier.  *Id.*, ¶ 84.  As explained below, this is a leap too far.

28

4

1    In a third effort to plausibly allege a "manufacturing" defect, plaintiffs add an allegation

2    that that the 2.4 liter engines "*during their manufacturing* incorporated improperly or

3    insufficiently coated compression rings or Low-Tension Oil Rings" that "allow excessive and

4    dangerous oil consumption…," leading to "premature ring wear."  SAC, ¶¶ 90-91 (emphasis

5    added).  These allegations do not show that the piston rings "differ[] from the manufacturer's

6    intended result" or "differ[] from apparently identical product from the same manufacturer," as is

7    required to show a manufacturing defect under California law.  *See Johnson*, 272 F. Supp. 3d at

8    1177.

9    Plaintiffs next allege that GM in 2013 changed the Oil Life Monitor on Subject Vehicles

10   to turn on the "Change Your Oil " light on the dashboard after no more than 7,500 miles of

11   driving; previously the maximum was 15,000 miles.  Plaintiffs describe this change as a devious

12   attempt to avoid warranty repair expense for engine damage rather than a proactive attempt to

13   reduce the possibility of excessive oil consumption for vehicles whose owners did not monitor

14   engine oil levels via periodic "dipstick" checks.  SAC, ¶¶ 120-21.

15   Then, in a fourth attempt to allege a manufacturing defect, plaintiffs allege, again "on

16   information and belief," that GM's 2.4 liter engines were designed "at most" to "consume *no*

17   *more than 1 quart per 8,000 miles* under normal service—a figure one-fourth the level later

18   designated unilaterally by GM … as not 'excessive,' e.g. normal."  SAC, ¶ 122 (emphasis in

19   original).  From this unsupported and uncertain premise, plaintiffs allege, "[s]ubject to further

20   investigation," that "because Class Vehicles that consumed oil at a rate greater that 1 quart per

21   8,000 miles or so consume oil at a rate greater than they are designed to do, they are defective in

22   their materials or workmanship…."  *Id.*, ¶ 123.  Both the premise and the reasoning are unsound.

23   Finally, plaintiffs say the required 2000 mile oil consumption test is unreasonable because

24   the test (a) "requires a minimum of five [service] appointments" at GM dealerships;[2] (b) exposes

---

25   [2]  This allegation is implausible.  Ms. Mitchell and Ms. Chambers were only asked to return to the
26   dealership *once*, after 2000 miles, for oil level checks.  SAC, ¶¶ 57, 66, 68 (Ms. Chambers only
     was asked again to bring her vehicle back after 2000 miles because she was not able to do so the
27   first time due to the birth of her first child).  The GM SCAs do not require that the 2000 mile oil
     test be repeated (*see*, *e.g.*, Request for Judicial Notice filed January 11, 2018 ("RJN"), Exhs I, J
28   and K), so there was no plausible reason why Ms. Mitchell would be told that she would have to
     bring the vehicle back for three rechecks before any repairs would be performed.  SAC, ¶ 57.

owners to "unreasonable safety risk and risk of serious potentially catastrophic engine or exhaust system damage" during the 2,000 mile test period; (c) is allegedly set up "to discourage customers from completing [the test], given the inconvenience, disruption, and expenses involved"; (d) is allegedly "unreliable"; and (e) ignores more reliable indicia of high oil consumption, including "[GM] dealers' service records, reports by customers of consumption rates, and reports from a customer's independent mechanic." SAC, ¶ 124. Ignoring the familiar principle that "if it ain't broke, don't fix it," they apparently contend that GM is not entitled to independently verify a malfunction before providing expensive free-of-charge repairs under warranty or the SCAs. This makes no sense.

## ARGUMENT

## I.     THE EXPRESS WARRANTY CLAIMS HAVE MULTIPLE DEFICIENCIES

Plaintiffs' First and Fifth Causes of Action claim breach of GM's limited express warranties under the Magnuson Moss Act and common law, respectively. The Magnuson Moss Act does not create new warranty obligations but merely provides a federal remedy for breach of state law warranties; thus, the First Cause of Action "stand[s] or fall[s]" with the state law warranty claims. *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

Here, as was true of the First Amended Complaint, there are still two separate and independently sufficient grounds for dismissal.

### A.     The GM Warranty Does Not Cover the Alleged Design Defects

As the Court previously ruled, the GM warranty only covers "defects related to materials or workmanship," not design defects. 2018 U.S. Dist. LEXIS 92318, *16-17. Plaintiffs claim in conclusory terms that there are "one or more design and/or manufacturing defects" in the Subject Vehicles, but they do not say, let alone plausibly explain, which of the various issues they have raised stem from defects in materials in workmanship rather than design. Further, as recognized in *Davidson v. Apple, Inc.*, 2017 U.S. Dist. LEXIS 36524, *34, 2017 WL 976048 (N.D. Cal. Mar. 14, 2017) "plaintiffs' chosen language is not dispositive in determining whether the alleged defect is a defect in design or a defect in 'materials and workmanship;'" thus, the Court must "determine whether [p]laintiffs allege a defect in 'design' or a defect in 'materials and workmanship.'"

6

1    In the June 1 Order, the Court held that plaintiffs' allegations raised only design issues,

2    including GM's alleged selection of "Low-Tension Oil Rings" that allegedly "do not apply

3    sufficient tension to prevent oil from being consumed in the combustion chamber."  2018 U.S.

4    Dist. LEXIS 92318, *20-22.  Just like the selection of "Low-Tension Oil Rings," the selection of

5    ring material or coatings is a design decision, not a warrantable manufacturing defect.  *See*

6    *Davidson*, 2017 U.S. Dist. LEXIS 36524, *35-36   ("A design defect … exists when the product

7    is built in accordance with its intended specification, but the design itself is inherently defective."

8    … A manufacturer's choice to use a certain material to construct a product is a "design decision,"

9    not a defect in "materials and workmanship."); *see also McCabe v. Am. Honda Motor Co.*, 100

10   Cal. App. 4th 1111, 1120 (2002).  Here, plaintiffs are attacking the design of *all* of the pistons and

11   piston rings, not defects introduced in *some of them* during the manufacturing process.

12   As the Court ruled previously, the alleged designs of the "spray jets," PCV system, Oil

13   Life Monitoring System and oil pressure light defects also fall outside the coverage of the GM

14   warranty.  2018 U.S. Dist. LEXIS, *21-22.

15   In a final effort to allege a defect in materials in workmanship, plaintiffs hypothesize "on

16   information and belief" and "subject to further investigation" that GM designed the 2.4 liter

17   engine to consume "at most" no more than one quart or oil in 8,000 miles.  SAC, ¶ 122.  This

18   speculation has no factual basis.  It is pulled out of thin air.  And it certainly does not satisfy the

19   Rule 9(b) requirement that plaintiffs identify the factual basis for "information and belief"

20   allegations.[3]  Based on this unsupported premise, plaintiffs argue that the engines "consume oil at

21   a rate greater than they are designed to do" and therefore "are defective in their materials or

22   workmanship…."  *Id.*, ¶ 123.  This is circular:  essentially, the argument is that a design that does

23   not meet the manufacturer's expectations is not a design defect, but a defect in materials or

24   workmanship.  This non sequitur collides head on with the established definition of a

25

26   [3]  See *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004) ("Although
     it is true that matters peculiarly within a defendant's knowledge may be pled 'on information and
27   belief,' this does not mean that those matters may be pled lacking any detail at all….  '[*T*]*he*
     *allegations must be accompanied by a statement of the facts upon which the belief is based*.'")
28   (emphasis added; citation omitted).

1    manufacturing defect as one that causes a product to "differ[] from apparently identical products

2    from the same manufacturer," *i.e.*, with the same design, for example an individual product that

3    comes off the assembly line in "substandard condition." *See Johnson*, 272 F. Supp. 3d at 1177.

4    That is not what plaintiffs are alleging here.  Indeed, such an allegation would be the death knell

5    for any class certification aspirations.  Instead, they are alleging a design defect pure and simple.

6    *See* in *Trusky v. General Motors Co.*, 2013 Bankr. LEXIS 620, *18-19 (Bankr. S.D.N.Y. Feb. 19,

7    2013) ("GM can be required [under the warranty] to replace spindle rods that were defective

8    because of materials or workmanship with new spindle rods of the same design within the

9    warranty period, *but it cannot be required to change the design of the spindle rods*") (emphasis

10   added).  Here, according to plaintiffs, *all* 2.4 liter pistons and piston rings are defective, not just a

11   few that did not meet GM's specifications, and all should be replaced with newly-designed parts.

12   This claim does not (and cannot be contorted to) allege a manufacturing defect.

13         The Second Amended Complaint is the third pleading in which plaintiffs have failed to

14   plausibly allege that the Subject Vehicles have a manufacturing defect, *i.e.*, a defect related to

15   materials and workmanship as opposed to an allegedly faulty design.  Accordingly, their claims

16   under the GM warranty now should be dismissed without leave to amend.

17         **B.**    **Failure To Request Repairs During the Warranty Period**

18         When purchased new, plaintiffs' vehicles were covered by GM's powertrain warranty for

19   5 years or 100,000 miles, whichever came first.  Upon re-sale, the GM warranty continued to

20   apply to the used vehicle for covered repairs during the remainder of the warranty period.  Both

21   the GM Warranty and the Magnuson Moss Act required plaintiffs to present their vehicles to

22   authorized GM dealers for repair during the warranty period.  RJN, Exhibits. E (p.4), F (p. 4), G

23   (p. 4) & H (p. 4); 15 U.S.C. § 2310(e) ("No action . . . may be brought . . . for failure to comply

24   with any obligation under any written or implied warranty . . . unless the person obligated under

25   the warranty … is afforded a reasonable opportunity to cure such failure to comply").

26         Further, under California law, free-of-charge repair or replacement is the *exclusive* remedy

27   under the GM Warranty.  *See* RJN, Exh. E (p. 10), Exh. F (p. 13); Exh. G (pp. 12-13) & Exh. H

28   (pp. 12-13); *Rice v. Sunbeam Products, Inc.*, 2013 U.S. Dist. LEXIS 7467, *34 (C.D. Cal. Jan. 7,

8

2013); Cal. Coml. Code §§ 2316(4), 2719(1).  This limitation of remedy bars damage suits for breach of warranty unless successful repairs are not completed after a reasonable number of attempts, such that the repair remedy "fails of its essential purpose."  Cal. Coml. Code § 2719(2); *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 808 (9th Cir. 1984) ("a repair or replace remedy fails of its essential purpose only if repeated repair attempts are unsuccessful within a reasonable time") (emphasis omitted).

Here, plaintiffs either did not request repairs for the alleged defect during the warranty period *or* did not submit to reasonable diagnostic tests designed to confirm the existence of a defect; absent independent confirmation of the defect by GM dealers, plaintiffs cannot adequately allege that repairs were improperly denied, or that repeated repair attempts were unsuccessful.

Mr. Hindsman purchased his model year 2010 Equinox in January 2010, but he does not allege that he requested repairs until the spring of 2015, after his five-year warranty had expired. The warranty does not cover repairs that are requested after it has expired.  *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 830-32 (2006); *In re MyFord Touch Consumer Litig.*, 46 F.3d 936, 970 (N.D. Cal. 2014) (dismissing claims of plaintiffs who did not allege presentation to a dealer for repair during the warranty period); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1179 (C.D. Cal. 2010) (plaintiffs who did not seek repairs "may not pursue a claim for breach of express warranty….").

Ms. Miranda did not request repairs before the October 5, 2017 incident, more than five years after her vehicle was initially placed in service on October 3, 2011.  SAC, ¶ 35-37.  Ms. Maryanski first sought repairs for the alleged Oil Consumption Defect when her vehicle had reached 103,499 odometer miles.  SAC, ¶ 48.  In both cases the GM's express warranty had expired.

Since all three of these plaintiffs' warranties had expired before they requested repairs, their claims now should be dismissed without leave to amend.

New plaintiffs Mitchell and Chambers both sought repairs during the warranty period, but neither completed an oil consumption test, so the GM dealers they went to were not given a fair

9

1  opportunity to diagnose, let alone repair their vehicles.[4]  *See* RJN, Exh. E (p. 4), F (p. 4), G (p.4)

2  & H (p. 4); 15 U.S.C. § 2310(e).  So these claims, too, should be dismissed, albeit without

3  prejudice to completion of the oil consumption test or other independent verification by GM

4  dealers.

5       **C.**    **Breach of Warranty Claims Based on the SCAs**

6       GM disputes, but accepts, the Court's holding that GM has not demonstrated on the face

7  of the pleadings that the SCAs are not warranties.  The Court denied GM's motion to dismiss the

8  SCA claims of plaintiffs Hindsman and Andrews, finding that they had sought timely repairs

9  within the respective SCA coverage periods for their model year 2010 and 2012 Equinoxes.

10       GM has inspected Mr. Hindsman's model 2010 Equinox.  It clearly exhibits excessive oil

11  consumption and, after less than ten years from purchase with an odometer reading of

12  approximately 118,000 miles, it is still eligible for free-of-charge repairs under the 2010 SCA.

13  GM has communicated this conclusion to plaintiffs' counsel and offered to set up an appointment

14  for the repairs at a GM dealership location convenient to Mr. Hindsman.

15       Mr. Andrews has withdrawn as a plaintiff in this case.

16       The Court granted with leave to amend GM's motion to dismiss the SCA claims of

17  plaintiffs Maryanski, Peterson and Miranda.

18       As the Court previously ruled, Ms. Peterson as the owner of a model year 2013 is not

19  covered by an SCA; also, she, too, has withdrawn as a plaintiff in this case.

20       Ms. Maryanski and Ms. Miranda both requested SCA repairs during their SCA coverage

21  periods.  Their vehicles therefore were potentially eligible for SCA repairs *assuming* that the

22  damage to their engines that was detected at the dealerships was caused by piston ring wear due

23  _____

24  [4]  While plaintiffs say the oil consumption test is "unreasonable," excessive oil consumption does
not occur in every vehicle.  It is dependent on various factors such as driving cycle and vehicle

25  maintenance.  GM must have some means to verify high oil usage before incurring the expense of
free-of-charge piston replacement.  Neither Ms. Mitchell nor Ms. Chambers alleges completing

26  the test or offering GM any other means of substantiating their claims of excessive oil
consumption.  GM is not obligated to provide repairs if there is no confirmed oil consumption

27  issue, and it is not required to simply take plaintiffs' word for it sight unseen, or the word of their
independent mechanic who may not have the same training or experience as a GM-certified

28  dealership technician.

10

1   to oil consumption, a claim that is not supported by any alleged facts.  Indeed, metal was found in

2   Ms. Maryanski's engine that could have been (and, GM believes, was) caused by something else.

3   SAC, ¶ 48.  Similarly, Ms. Miranda's vehicle suffered a complete engine failure that could have

4   been caused my many potential issues other than piston ring wear.  *Id.*, ¶ 40. These plaintiffs have

5   not alleged any plausible factual basis for their claim that the damage was caused by excessive oil

6   consumption.

7       Ms. Mitchell and Ms. Chambers, the two new plaintiffs, each presented their vehicles for

8   repair during their SCA coverage periods, but as noted above neither alleges completing an oil

9   consumption test or providing their GM dealers with any other evidence substantiating their

10  claims of high oil consumption.  *See* SAC, ¶¶ 57-60, 66-71.

11      **D.**      **Summary of Breach of Express Warranty Claims**

12          ***1.***      ***Alleged Breach of GM Warranty***

13      Except for SCA claims, all of plaintiffs' breach of warranty claims should be dismissed

14  without leave to amend because the GM warranty does not cover claims of design defects.

15      Separately, (a) the express warranty claims of plaintiffs Hindsman, Maryanski and

16  Miranda should be dismissed without leave to amend for failure to present their vehicles to GM

17  dealers for repair within the powertrain warranty period; and (b) the express warranty claims of

18  plaintiffs Mitchell and Chambers should be dismissed without prejudice for failure to permit GM

19  dealers to diagnose and, if needed, repair their vehicles within the GM powertrain warranty

20  period.

21          ***2.***      ***Alleged Breach of Special Coverage Adjustments***

22      The SCA claims of plaintiff Hindsman should be dismissed without prejudice as moot

23  pending the repairs for which he is eligible under the SCA.

24      The SCA claims of plaintiffs Maryanski and Miranda should be dismissed for failure to

25  allege facts showing that the alleged damage to their engines was the result of excessive oil

26  consumption for which the SCAs offer free-of-charge repairs.

27      The SCA claims of plaintiffs Mitchell and Chambers should be dismissed for failure to

28  permit GM dealers to diagnose and, if necessary, repair their vehicles within the special coverage

11

1  period.  These dismissals should be without prejudice to their ability to give GM dealers the

2  required reasonable opportunity to determine whether their vehicles use excessive oil.

3  **II.    THE CLRA AND UCL CLAIMS HAVE MULTIPLE DEFICIENCIES**

4        **A.    Plaintiff Hindsman Does Not Adequately Plead GM's Knowledge of the**

5            **Alleged Defect at the Time He Purchased His Equinox in January 2010**

6        To plead a duty to disclose plaintiffs must allege a safety-related defect that was known to

7  GM at the time they purchased their vehicles.  *Grodzitsky v. Am. Honda Motor Co.*, 2013 U.S.

8  Dist. LEXIS 33387, *16, 2013 WL 690822 (C.D. Cal. Feb. 19, 2013) (emphasis added), citing

9  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1143-46 (9th Cir. 2012); *Sloan v. GM LLC*, 2017

10  U.S. Dist. LEXIS 120851, *16-17 (N.D. Cal. Aug. 1, 2017) ("defendant [must have been] aware

11  of the defect at the time of sale to establish … a duty to disclose"); *see also Resnick v. Hyundai*

12  *Motor Am., Inc.*, 2017 U.S. Dist. LEXIS 67525, *49-50, *52 (C.D. Cal. Apr. 13, 2017) (pre-sale

13  knowledge allegations were insufficient because they involved "an insufficiently small number of

14  complaints, complaints posted in forums unrelated to the defendant, complaints made after the

15  sale dates, or some combination of those circumstances," citing *Williams v. Yamaha Motor Co.,*

16  851 F.3d 1015, 1027 n. 8 (9th Cir. 2017).

17        Plaintiff Hindsman purchased his model year 2010 Equinox in January 2010.  SAC, ¶ 22.

18  To establish GM's knowledge of the alleged defect, plaintiffs rely upon (1) complaints on the

19  NHTSA website, the first of which was posted in March 2015, *five years* after Mr. Hindsman

20  purchased his 2010 Equinox (*see* SAC, pp. 41-49); (2) complaints on a *third-party* website that,

21  with two exceptions, also were posted after Mr. Hindsman's purchase (SAC, pp. 49-57); (3) a

22  service bulletin, actually the SCA for 2011 model Equinoxes, that was issued *in July 2015* (SAC,

23  ¶¶ 111-13 & Exh. 7); (3) alleged knowledge of an *oil seal* issue (not a piston ring issue) *in*

24  *different engines* based on a 2007 service bulletin (FAC, ¶ 110;[5] SAC, ¶ 176) and (4) an article in

---

25  [5]  The Second Amended Complaint drops this allegation, but refers to it at SAC, ¶ 176, possibly

26  inadvertently.  The June 1 Order specifically rejected this allegation.  2018 U.S. Dist. LEXIS
   92319, *37.  The 2007 service bulletin for repair of the crankshaft front oil seal or a clogged

27  Pressure Relief Valve system to remedy external oil *leakage* in 2.8, 3.1, 3.4, 3.5 and 3.8 liter 60-
   degree V-6 engines has nothing to do with oil *consumption* issues in the 2.4 liter in-line 4 cylinder

28  engines that were introduced in 2009.  FAC, ¶ 110. case.

12

1    *TechLink*, a GM publication for dealer service personnel, that discussed oil consumption issue

2    and was published in July 2012, *thirty months after the Hindsman purchase* (SAC ¶¶ 78-81).

3         The infinitesimal number of online complaints posted on a third party website (*i.e.*, not

4    related to GM) prior to the Hindsman purchase, the later postings on that website and the NHTSA

5    website, and the service bulletin that GM posted *years* after Mr. Hindsman bought his Equinox

6    obviously are not probative of the state of GM's knowledge of oil consumption issues before

7    January 2010. *Resnick*, 2017 U.S. Dist. LEXIS 67525, *49-50, *52.

8         In the First Amended Complaint, which the Court found deficient regarding the issue of

9    GM's knowledge, the earliest complaint copied from the third-party site was posted in November

10   2012, nearly three years after Mr. Hindsman's January 2010 purchase. *See* FAC, p. 37. The vast

11   majority of the other complaints copied from this site were posted in 2015 or later. The Second

12   Amended Complaint quotes four additional complaints from this website that were (allegedly)

13   posted on September 15, 2009, November 27, 2009, April 2, 2010 and September 1, 2010. SAC,

14   pp. 50-51. The two 2010 complaints were posted months after the Hindsman purchase.

15        The September 2009 complaint notes that the complainant's oil was 1.5 quarts low, but

16   appears to be aimed exclusively at the dealer's failure to notice or acknowledge the low oil level

17   and says nothing about its cause or any other relevant circumstances, *e.g.*, how long had it been

18   since the last oil change, how many miles were driven in the oil consumption test, etc. *Id.*, p. 50.

19        The posting date for the November 2009 complaint *must* be a mistake. The complainant

20   states that "I have 80,000 miles on my car at this point. However, this oil consumption has been

21   happening since I have owned the car." SAC, p. 50. The 2010 Equinox went on sale at the

22   beginning of the 2010 model year, which generally starts midway through the third quarter of the

23   prior calendar year (here, 2009). It is implausible that this vehicle was driven 80,000 miles in a

24   few short months. More likely, the complaint was posted much later and November 27, 2009 was

25   the purchase date ("this oil consumption has been happening since I have owned the car").

26        Such sparse and questionable postings do not plausibly show the state of GM's knowledge

27   about 2.4 liter oil consumption issues in January 2010, nor do plaintiffs provide any basis for

28

13

1   believing that GM learned of these complaints when they were posted, or shortly thereafter or,

2   indeed, at any time.

3       Similarly, the "service bulletin" cited by plaintiffs (which is actually part of the SCA for

4   2011 model year vehicles) was not issued until July 2015 and was posted on the NHTSA website

5   at that time.  SAC, Exh. 7; RJN, Exhs. J & L.  (The SCA for 2010 model vehicles had been issued

6   earlier, in March 2014.  RJN, Exh. I.)

7       The *TechLink* article appeared thirty months after Mr. Hindsman purchased his vehicle.

8   As stated in the article, excessive oil consumption "may not be evident until the vehicle has

9   accumulated 20,000 miles."  SAC, Exhibit 3, p. 3.  While GM was aware of this issue for some

10  period of time before the *TechLink* article was published in July 2012, the allegation that GM

11  knew of the issue and its cause (piston ring wear) in January 2010, within a few months of this

12  model's introduction, is implausible.[6]

13      Finally*,* plaintiffs' generalized allegations about unspecified "pre-release testing data,"

14  "early consumer complaints," "testing conducted in response to those complaints," and

15  "aggregate data from GM dealers" (SAC, ¶ 89) do not plausibly show that GM knew about the

16  alleged defect before January 2010, let alone that it knew of any unreasonable safety hazard.

17  Numerous decisions have rejected similar conclusory allegations.  *E.g.*, *Wilson*, 668 F.3d at 1147

18  & cases cited ("The allegation that [Hewlett-Packard] … had 'access to the aggregate information

19  and data regarding the risk of overheating' is speculative and does not suggest how any tests or

20  information could have alerted HP to the defect'").  Indeed, in *Herremans v. BMW of North*

21  *America, LLC*, 2014 U.S. Dist. LEXIS 145957, *54-55 (C.D. Cal., Oct. 3, 2014), Judge Morrow

22  rejected allegations that are almost the same as those made here:

23

24  [6] Plaintiffs claim on information and belief that the *TechLink* article reproduces information
    contained in a Technical Service Bulletin ("TSB") published "prior to July 2012."  SAC, ¶¶ 78,
25  81, 83.  They do not allege how long before July 2012 it was published, so this allegation does
    not plausibly show that GM knew about the oil consumption issue or its cause before January
26  2010.  For informational purposes, GM notes that it has produced to plaintiffs (after filing of the
    Second Amended Complaint) a "preliminary information" service bulletin referencing oil
27  consumption issues in model year 2010 Equinoxes (PIP5025) that was originally released in May
28  2012.  Plaintiffs do not allege whether this is the TSB they are referring to.

14

1

2

> Herremans' … general reference to "internal testing, records of customer complaints, dealership repair records" as other internal sources" provides little, if any, factual foundation for her conclusion that BMW knew of the defect. … Herremans references "pre-release testing data, warranty data, customer complaint data, and replacement part sales data" and "other internal sources of aggregate information about the problem." This allegation is similarly conclusory and deficient because it does not plausibly indicate that BMW knew of the defect prior to the time it distributed the class vehicles.

3

4

5

6    Thus, none of plaintiffs' allegations plausibly shows that GM knew about the alleged

7    defect or any claimed safety risk before Mr. Hindsman purchased his vehicle.

8          **B.      Plaintiffs Miranda and Maryanski Fail To Adequately Allege Reliance**

9    The June 1 Order dismissed without leave to amend the CLRA and UCL claims of Ms.

10   Miranda and former plaintiff Andrews for failure to plead "facts that plausibly suggest that had

11   GM disclosed the [alleged defect] they would have been aware of the disclosure." 2018 U.S.

12   Dist. LEXIS 92319, *41. They have not pleaded that they reviewed any advertising materials

13   before purchasing their Vehicles; nor have they alleged that they had "specific interactions with

14   GM before purchasing their vehicles…." *Id.*

15   Ms. Miranda purchased a used model year 2012 Equinox from a Nissan dealership in

16   January 2015. SAC, ¶ 35. She does not (and presumably cannot) allege any "specific interaction

17   with GM" before purchasing her vehicle. Instead, for the first time in the Second Amended

18   Complaint, she alleges in conclusory terms that she "reviewed [unspecified] marketing materials

19   and brochures issued by GM." She does not allege, and it absurd to say the least, that marketing

20   materials or brochures for a three-model-year-old Chevrolet were available at the Nissan

21   dealership in 2015, nor does she say what kind of advertising materials she reviewed, where or

22   from whom she obtained them, or whether the materials she reviewed were for the model year

23   2012 Equinox that GM had marketed three model years earlier or, indeed, for any Equinox.

24   Thus, her allegations are not sufficient under the specific pleading requirements of Rule 9(b). *See*

25   *Parenteau v. GM, LLC*, 2015 U.S. Dist. LEXIS 31184, *19, 2015 WL 1020499 (C.D. Cal. March

26   5, 2015) (dismissing used car purchaser's claims that did not allege "any contact with [GM] (as

27   opposed to the dealer) prior to purchasing the vehicle where omissions regarding the defect at

28   issue should or could have been revealed" and did not "allege *with any specificity* which

advertisements, offers, or other representations she relied on that failed to include the omitted information") (emphasis added); *Eisen v. Porsche Cars North America, Inc.*, 2012 U.S. Dist. LEXIS 116836, *9 (C.D. Cal. Feb. 22, 2010) ("Following *Kearns*,[7] in order to plead the circumstances of omission with specificity plaintiff 'must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase….'"), quoting *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009). Here, Ms. Miranda does not identify (let alone provide representative samples of) *any* of the GM advertising materials she claims to have reviewed. This is not sufficient.

Ms. Maryanski also has not made the specific reliance allegations required by *Kearns*. She does not allege that she reviewed *any* GM advertising or brochures before purchasing her used model year 2011 Equinox. *See* SAC, ¶¶ 43-51. And, like Ms. Miranda and the used car purchaser in *Parenteau*, she does not allege any "specific interactions with GM" ("as opposed to the dealer") prior to purchase. *See* June 1 Order, 2018 U.S. Dist. LEXIS 92319, *41; *Parenteau*, 2015 U.S. Dist. LEXIS 31184, *19. So her CLRA and UCL claims must also be dismissed.

## III.   THE IMPLIED WARRANTY CLAIMS FAIL ON MULTIPLE GROUNDS

The Court previously dismissed the implied warranty claims of Ms. Miranda and Ms. Maryanski without leave to amend on the ground that GM issued no implied warranties to used vehicle purchasers. Mr. Hindsman's claims were dismissed with leave to amend on two grounds: (1) failure to allege that his vehicle was "ever inoperable, useless or unsafe"; and (2) expiration of the four-year statute of limitations (Cal. Coml. Code § 2725) that applies to implied warranty claims. 2018 U.S. Dist. LEXIS 92319, *43-45. His claims continue to be barred on one or both of these grounds and the same is true of the new plaintiffs' claims.

### A.   Plaintiffs Do Not Adequately Allege Unmerchantability

Mr. Hindsman has not pleaded any additional facts in the Second Amended Complaint that would support a claim that his vehicle was "ever inoperable, useless or unsafe." His implied warranty claims therefore should be dismissed without leave to amend. *See also American Suzuki*

---

[7]  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125-27 (9th Cir. 2008).

1   *Motor Co. v. Superior Court,* 37 Cal. App. 4th 1291, 1296, 1297 (1995) (test of merchantability is

2   *not* "whether [a vehicle] is free of all speculative risks, safety-related or otherwise," but whether it

3   "manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of

4   providing transportation"); *Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1079

5   (C.D. Cal. 2014) (rejecting unmerchantability claim where the alleged defect "did not 'drastically

6   undermine[] the ordinary operation of the vehicle' and indeed failed to implicate the vehicle's

7   operability at all") (citation omitted).

8         Ms. Mitchell does not allege that there were any oil consumption issues with her vehicle –

9   let alone issues that rendered it "inoperable, useless or unsafe" – until *more than four years after*

10  *she leased her Equinox*, long after the one-year implied warranty period provided by section

11  1791.1(c) of the Song-Beverly Act had expired.  Specifically, she alleges that in June 2017, more

12  than four years after she leased her model year 2012 Equinox on February 2, 2013, her vehicle

13  "shut off unexpectedly and without warning during operation," forcing her "to pull off the road

14  and out of traffic.  SAC, ¶¶ 52, 55.  Her dealership replaced the camshaft actuator solenoid.  *Id.*

15  Upon information and belief, she claims that the shutdown "was actually caused by the Oil

16  Consumption Defect" and should have been repaired free-of-charge under the SCA.  *Id.*  She does

17  not, however, allege any subsequent shutdowns or failures, despite the lack of SCA repairs and

18  continued oil consumption issues.

19        As Judge Gilliam noted in *Valencia v. Volkswagen Grp. of Am., Inc.*, 119 F. Supp. 3d

20  1130, 1139 (N.D. Cal. 2005), "[t]he majority of cases … hold that the Song-Beverly Act requires

21  the alleged defect to manifest within the … implied warranty period"), citing *Marchante v. Sony*

22  *Corp. of America, Inc.*, 801 F. Supp. 3d 1013, 1021-22 (S.D. Cal. 2011); *Peterson v. Mazda*

23  *Motor of Am., Inc.*, 44 F. Supp. 3d 965, 969-72 (C.D. Cal. 2014); *McVicar v. Goodman Global,*

24  *Inc.*, 1 F. Supp. 3d 1044, 1057-58 (C.D. Cal. 2014); *Grodzitsky v. Am. Honda Motor Co.*, 2013

25  U.S. Dist. LEXIS 82746, *23-26, 2013 WL 2631326, *10-11 (C.D. Cal. Jun. 12, 2013); and *Elias*

26  *v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 852-53 (N.D. Cal. 2012).  To be sure, Judge

27  Gilliam acknowledged a contrary view that a defect that exists during the implied warranty period

28  but is not discovered until after it has expired may be actionable, *see Mexia v. Rinker Boat Co.*,

17

1   174 Cal. App. 4th 1297, 1304-05 (2009), but he correctly limited the *Mexia* holding to a product

2   that is "unmerchantable the very moment it was purchased." 119 F. Supp. 3d at 1139-40.  Here,

3   where the alleged oil consumption arises from piston ring wear that may (or may not) develop

4   over time, the *Mexia* holding simply does not apply.

5        The same analysis requires dismissal of Ms. Chambers' implied warranty claim.  She

6   purchased a model year 2011 Equinox in June 2011. SAC, ¶ 61.  In early April 2016, almost five

7   years after purchase, she noticed that her vehicle "sounded extremely rough when starting and

8   when … idling."  *Id.*, ¶ 64.  Despite this experience and several repeat complaints and service

9   appointments at her dealership, she does not allege that her vehicle was ever "inoperative, useless

10  or unsafe," *see Resnick v. Hyundai Motor Am., Inc. ["Resnick II"],* 2017 U.S. Dist. LEXIS

11  139179, *36 (C.D. Cal. Aug. 21, 2017), or that she ever stopped driving it, *see Lee v. Toyota

12  Motor Sales, U.S.A., Inc.,* 992 F. Supp. 2d 962 (C.D. Cal. 2014).  Separately, Ms. Chambers does

13  not allege any issues with her vehicle until almost four years after the one-year implied warranty

14  period had expired.

15          **B.      The Implied Warranty Claims Are Barred by the Statute of Limitations**

16       The four-year limitations period of Cal. Coml. Code § 2725 applies to implied warranty

17  claims under the Song-Beverly Act.  *Valencia,* 119 F. Supp. 3d at 1411.  Under section 2725, the

18  cause of action "accrues when the breach occurs, *regardless of the aggrieved party's lack of*

19  *knowledge of the breach*.  A breach of warranty occurs *when tender of delivery is made*, except

20  that where a warranty explicitly extends to future performance of the goods and discovery of the

21  breach must await the time of such performance, the cause of action accrues when the breach is or

22  should have been discovered."  *Id.,* § 2725(2) (emphasis added).  Courts consistently hold that

23  implied warranties *do not* "'explicitly extend[] to future performance of the goods.'"  *MacDonald*

24  *v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1100 (N.D. Cal. 2014), quoting *Cardinal Health 301,*

25  *Inc. v. Tyco Electronics Corp.*, 169 Cal. App. 4th 116, 131 (2008); see also *Philips v. Ford Motor*

26  *Co.*, 2016 U.S. Dist. LEXIS 58954, *40-42 (N.D. Cal. May 3, 2016); *In re Takata Airbag Prods.*

27  *Liab. Litig.*, 2016 U.S. Dist. LEXIS 138976, *177-78, 180-81 (S.D. Fla. Sept. 30, 2016).  Thus,

28  the limitations period on implied warranty claims begins running at "the tender of delivery."

18

1    Implied warranties arise from the sale of "consumer goods," including new vehicles.  *See*

2    Civ. Code §§ 1791(a), 1792.  Thus, when Hindsman took delivery of his new model year 2010

3    Equinox in January 2010 (SAC, ¶ 22), he received a GM express warranty and an implied

4    warranty under Song-Beverly.  Since the implied warranty did not, as a matter of law, "explicitly

5    extend[] to future performance" of the vehicle, his cause of action accrued upon delivery in

6    January 2010 and the four-year limitations period expired in January 2014, long before he filed

7    this suit.  The same is true of the new plaintiffs' implied warranty claims.  Ms. Mitchell leased her

8    2012 Equinox in February 2013, more than four years before the shutdown incident in June 2017.

9    SAC, ¶¶ 52, 55.  And Ms. Chambers purchased her 2011 Equinox in June 2011, almost five years

10   before she first noticed any issue with her vehicle in April 2016.  *Id.*, ¶¶ 61, 64.

11   Plaintiffs' tolling allegations do not defeat the bar of limitations under section 2725.  First,

12   as discussed above, under the express terms of section 2725 the discovery rule simply does not

13   apply.  Second, plaintiffs' conclusory allegations of concealment  (SAC, ¶¶ 194-99) do not satisfy

14   their burden to defeat the bar of limitations.  *Investors Equity Life Holding Co. v. Schmidt*, 195

15   Cal. App. 4th 1519, 1533 (2011).  To do so, they must "plead *with particularity* the facts giving

16   rise to the fraudulent concealment claim" and show that they "used due diligence in an attempt to

17   uncover the facts."  *Philips v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 58954, *45 (emphasis

18   added), citing *Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063, 1071 (S.D.Cal. 2015), and *Investors*

19   *Equity*, 195 Cal. App. 4th at 1533.

20   Plaintiffs' allegations here are completely conclusory and do not include the "specific

21   substantiating facts" or "affirmative acts of concealment" that Rule 9(b) requires to plead "active

22   concealment" of the alleged defect.  *Taragan v. Nissan N. Am., Inc.,* 2013 U.S. Dist. LEXIS

23   87148, *21-25, 2013 WL 3157918 (N.D. Cal. June 20, 2013); *Tietsworth v. Sears*, 720 F. Supp.

24   2d 1123, 1134 (N.D. Cal. 2010) ("a plaintiff cannot establish a duty by pleading, in a purely

25   conclusory fashion, that a defendant was in a superior position to know the truth about a product

26   and actively concealed the defect").

27   Plaintiffs do not plead particularized—or any—facts showing concealment.  Instead, they

28   allege simple non-disclosure, which does not suffice.  *Gray v. Toyota Motor Sales, U.S.A.*, 2012

19

1   U.S. Dist. LEXIS 15992, *26-28, 2012 WL 313703 (C.D. Cal. Jan. 23, 2012), aff'd 554 Fed.

2   Appx. 608 (9th Cir. 2014) ("[I]f mere nondisclosure constituted 'active concealment,' the duty

3   requirement would be subsumed and any material omission would be actionable.  This is not the

4   law."); *Resnick II*, 2017 U.S. Dist. LEXIS 139179, *39 (plaintiff alleging fraudulent concealment

5   "'must establish that its failure to have notice of its claim was the result of affirmative conduct by

6   the defendant'") (citation omitted)

7        Mr. Hindsman learned about the specific oil consumption issue in this vehicle when he

8   received an SCA notice from GM in early 2014, outside the four-year limitations period that

9   began when he purchased his Equinox in January 2010.  SAC, ¶¶ 28-29.  Yet before that, in 2010

10  and 2011, he noticed what he believed to be excessive oil consumption.  *Id.*, ¶¶ 25-27.  Assuming

11  the truth of these allegations, he was admittedly on inquiry notice of the issue before limitations

12  expired and therefore under Rule 9(b) he must, but does not, allege "with particularity" facts

13  showing he "used due diligence in an attempt to discover the facts."  *Philips*, 2016 U.S. Dist.

14  LEXIS 58954, *45; *Investors Equity*, 195 Cal. App. 4th at 1533; *see Hobart v. Hobart Estate Co.*,

15  26 Cal. 2d 412, 438-39 (1945) ("'[A]s the means of knowledge are equivalent to knowledge, *if it*

16  *appears that the plaintiff had notice or information of circumstances which would put him on*

17  *an inquiry* which, if followed, would lead to knowledge … he will be deemed to have had actual

18  knowledge of these facts'"), citing *Lady Washington C. Co. v. Wood*, 113 Cal 482, 487 (1896)

19  (italics added in *Hobart*).

20       Ms. Mitchell and Ms. Chambers merely allege that unspecified GM advertising materials

21  they say they reviewed did not mention the alleged Oil Consumption Defect.  SAC, ¶¶ 53, 62.

22  These are at worst allegations of "mere nondisclosure," not "affirmative acts of concealment," nor

23  are the advertising materials alleged with the particularity required to plead a concealment claim

24  under Rule 9(b).

25       Finally, tolling based on "estoppel" requires allegations of "reliance by the plaintiff on the

26  words or actions of the defendant that repairs will be made."  *Cardinal Health*, 169 Cal. App. 4th

27  at 134.  Here, plaintiffs do not allege any assurance that repairs would be made.  To the contrary,

28  Mr. Hindsman was told that repairs *would not be made* (SAC, ¶¶ 29-31), and Ms. Mitchell and

1   Ms. Chambers did not complete the oil consumption tests that would have allowed their dealers to

2   determine whether or not they were eligible for SCA repairs; thus, they do not (and obviously

3   cannot) allege receiving any assurance that repairs would be made (*id.*, ¶¶ 57-59, 67-68).

4                                    **CONCLUSION**

5         For all the foregoing reasons, GM respectfully requests that the Court grant its motion in

6   all respects.

7         Dated: August 15, 2018                GREGORY R. OXFORD
                                                ISAACS CLOUSE CROSE & OXFORD LLP
8

9                                               */s/ Gregory R. Oxford*
                                                Attorneys for Defendant
10                                              General Motors LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GM'S MOTION TO DISMISS SECOND AMENDED
COMPLAINT, CASE NO. 3:17-CV-05337-JSC